FILED

2015 Aug-24 PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

1

2

3

4      _____

5                                        )

6      In Re:                            )

7                                        )

8      Fairfield Shopping Center, LLC )

9      _____ )

10

11           EXAMINATION UNDER OATH OF STEVEN D. RISS

12                  Los Angeles, California

13               Wednesday, April 18, 2012

14                       Volume I

15

16

17

18

19

20

21     Reported by:

22     CATHRYN L. BAKER

23     CSR No. 7695

24     Job No. 141218C

25     PAGES 1 - 51

                                              Page 1

1

2

3

4     _____

5                                      )

6     In Re:                           )

7                                      )

8     Fairfield Shopping Center, LLC )

9     _____)

10

11                Examination Under Oath of STEVEN D.

12    RISS, Volume I, taken on behalf of American Safety

13    Indemnity Company, at 835 Wilshire Boulevard, Los

14    Angeles, California, beginning at 11:26 A.M. and

15    ending at 12:15 P.M. on Wednesday, April 18, 2012,

16    before Cathryn L. Baker, Certified Shorthand

17    Reporter No. 7695.

18

19

20

21

22

23

24

25

                                          Page 2

```
1    APPEARANCES:

2

3    For American Safety Indemnity Company:

4        BOVIS KYLE & BURCH, LLC

5        BY:  STEVEN J. KYLE, ESQ.

6        200 Ashford Center North

7        Suite 500

8        Atlanta, Georgia 30338-2668

9        (770) 668-0878

10       kyle@boviskyle.com

11

12   For GE Commercial Finance Business Property Corp:

13       ADAMS AND REESE LLP

14       BY:  STEPHEN A. ROWE, ESQ.

15       2100 Third Avenue North

16       Suite 1100

17       Birmingham, Alabama 35203-3367

18       (205) 250-5000

19       steve.rowe@arlaw.com

20

21

22

23

24

25
```

Page 3

```
 1                        INDEX

 2   WITNESS                        EXAMINATION

 3

 4   STEVEN D. RISS

 5

 6               (By Mr. Kyle)            5, 43

 7               (By Mr. Rowe)           30, 47

 8

 9

10                       EXHIBITS

11   NUMBER                              PAGE

12   Exhibit  1    E-mail string - September 13,

13                 2010 to Kui Chen from Steven

14                 Riss                       11

15

16

17

18

19

20

21

22

23

24

25

                                         Page  4
```

1        Wednesday, April 18, 2012; Los Angeles, California

2                         11:25 A.M.

3                        -- oOo --

4

5                    STEVEN D. RISS,

6            The witness, having been administered an

7    oath in accordance with CCP Section 2094, testified

8    as follows:

9

10                       EXAMINATION

11   BY MR. KYLE:

12       Q    Would you state your full name for the

13   record.

14       A    Steven David Riss.

15            MR. KYLE:  Would you, please, Madam Court

16   Reporter, put the same deposition stipulation that

17   we've used in the last depositions about reserving

18   all objections, that sort of stuff.

19            (The following statement was copied

20            from Yair Ben-Moshe's examination

21            under oath taken 4/17/12:

22            MR. ROWE:  "Before we get

23            started, I'm really just making a

24            statement for the record.

25                 "Before we get started,

                                          Page 5

1          there's no litigation that's

2          currently ongoing between GE and

3          American Safety.  There may be in

4          the future, and this deposition or

5          this statement might be -- one

6          party or the other might want to

7          utilize this.

8               "So Mr. Kyle and I have

9          agreed -- I just want to state for

10         the record that we're reserving any

11         and all objections to anything that

12         comes up here today for ruling by a

13         judge if it ever comes to that

14         point.

15              MR. KYLE:  "That's acceptable.")

16   BY MR. KYLE:

17       Q   Mr. Riss, my name is Steve Kyle.  I'm going

18   to be asking just a few questions.

19           This is your examination under oath.  It's

20   taken pursuant to the terms and conditions of the

21   policy of insurance written by American Safety

22   Indemnity Company.  Policy No. 201 CMP 1000482-10.

23   Named insured:  Fairfield Shopping Center, LLC.

24   Mailing address:  Ybm Properties, 500 North

25   Larchmont Los Angeles, California 90004.  Policy

                                           Page 6

1    period:   September 15, 2010 to September 15, 2011.

2              My questions are going to be tunneled and

3    focussed on just a few items.

4              First of all, just for the record, can you

5    give me your address that you work.

6        A    19867 Prairie Street, Suite 250, Chatsworth,

7    California 91311.

8        Q    What is your occupation, please?

9        A    I'm a vice president of AmWINS Insurance

10   Brokers.   I'm a wholesale insurance broker.

11       Q    Can you explain the difference between a

12   wholesale insurance broker and a retail agent or a

13   retail broker.

14       A    Yes.  As a wholesale broker, my clients are

15   retail insurance brokers.  I do not work with

16   insureds or end clients.  I only work with licensed

17   insurance agents placing excess and surplus-type

18   risks for them on their behalf.

19       Q    And can you explain the excess and surplus

20   lines market.  What does that term denote in the

21   insurance industry?

22       A    Basically, it's casually known as

23   harder-to-place accounts.  Accounts that retail

24   agents cannot place directly and need a wholesaler

25   like myself who has access to carriers that write

                                              Page 7

1    tougher risks.

2            They approach us with the same submission

3    they would go to one of their regular carriers, but

4    their regular carriers will decline those types of

5    accounts.  So they have to come to me to get it

6    placed.

7        Q    And then you in turn survey the market to

8    see an appropriate placement with an insurance

9    company?

10       A    Correct.

11       Q    Your dealings are with the end insurance

12   company who finally writes the policy?

13       A    Mostly.

14       Q    And the retail agent is the one who

15   communicates with the insured?

16       A    Correct.

17       Q    In this instance, did you have any contact

18   at all with the insured or any of its

19   representatives?

20       A    No.

21       Q    The name Yair Ben-Moshe, have you ever

22   spoken to Mr. Ben-Moshe about the Fairfield Shopping

23   Center account?

24       A    No.

25       Q    Item No. 2.  Did you have an understanding

Page 8

1    as to -- let me strike that.

2          I assume Shomer Insurance Agency came to you

3    with an application for insurance?

4          A    Yes.

5          Q    Is that the normal course of events?

6          A    Yes.

7          Q    Let me show you Exhibit No. 14.  Is that a

8    copy of the insurance application that would have

9    been submitted to AmWINS for consideration?

10         A    Yes.

11         Q    Now, in that particular application, we

12   don't know if this is the original, this is just a

13   copy.  It does not appear to have Mr. Ben-Moshe's or

14   anybody from Fairfield signing it, but it does have

15   Mr. Schneerson's signature.  He's going to check to

16   see if Mr. Ben-Moshe signed it.

17         But with regard just to signatures in

18   general, does AmWINS require an application

19   submission to be signed by the insured?

20         A    AmWINS does not.

21         Q    Does it rely upon the truth and veracity of

22   the documents by relying upon the retail agent to

23   secure that information and report it properly?

24         A    Yes.

25         Q    Now, in this instance, do you know, why was

                                              Page  9

1    Shomer Insurance Agency coming to you to place this
2    risk?
3         A    Yes.
4         Q    And what were the circumstances?
5         A    I believe the building was either vacant at
6    the time of renewal or in the process of becoming
7    vacant when it came up for renewal in September of
8    2010.
9         Q    Shomer was looking for an insurance company
10   who would insure a vacant and unoccupied building?
11        A    Correct.
12        Q    Since they could not place that through
13   normal means, they came to your agency as -- your
14   brokerage, as a wholesale broker, to place the
15   business?
16        A    Correct.
17        Q    Now, did a time come about when you tried to
18   place this policy or place this risk?
19        A    Yes.
20        Q    And who did you try to place it with?
21        A    In our original marketing efforts we
22   probably sent it to between five and ten various
23   insurance companies.
24        Q    I'm not going to ask you to identify those,
25   that may be proprietary.  But you ended up

                                              Page 10

```
 1    submitting it to American Safety Indemnity Company,
 2    did you not?
 3        A    Correct.
 4        Q    I want to show you a series of e-mails.
 5    Let's mark this as Riss No. 1.
 6            MR. KYLE:  Steve, I do not have a copy of
 7    that -- I've got a working copy here.  I don't have
 8    an extra copy.
 9            (Deposition Exhibit 1 was marked for
10    identification.)
11    BY MR. KYLE:
12        Q    Sir, I'm going to hand you Exhibit No. 1,
13    which is a series of e-mails.  If you'll turn to
14    page 4 of 5.  That's where the e-mails begin.  Page
15    5 is just some notice of confidentiality provision?
16        A    Sure.
17        Q    Let's start my questioning with regard to
18    this e-mail from you to Kui Chen at ASI on August
19    13.
20            What were you asking Ms. Chen to consider,
21    please.
22        A    To consider quoting the general liability
23    and property perils for this named insured.
24        Q    And did you submit to her --
25        A    Him.
```

Page 11

```
 1        Q     Excuse me.
 2              Did you forward to him a copy of the
 3   commercial insurance application which is marked
 4   Exhibit 14 to Yair Ben-Moshe's examination?
 5        A     Yes.
 6        Q     And you pointed out that it was not a
 7   shopping center, although it bore that name,
 8   correct?
 9        A     Correct.
10        Q     You pointed out it was formerly occupied by
11   a single telemarketing tenant but the building has
12   been vacant since June of 2010.  Where did you get
13   that information?
14        A     That information was e-mailed to me with the
15   submission from Donna, her last name --
16        Q     Ratliff?
17        A     Ratliff.  From Shomer Insurance Agency.
18        Q     The last sentence indicated that their
19   current policies are with Distinguished Programs who
20   is non-renewing.  Is Distinguished Programs part of
21   the AIG family, or were they at that time?
22        A     Yeah.  Distinguished Programs, I believe, is
23   a risk purchasing group that uses various insurance
24   companies.  And I believe at that time they were
25   using Granite State Insurance Company, which is, I
```

Page 12

1   believe, an AIG company, yes.

2        Q    Distinguished Programs, would they be an

3   insurance -- wholesale broker?

4        A    They would be officially considered an MGA,

5   a Managing General Agency.  But in this

6   circumstance, yes, a retail agency can go to them

7   direct and they can quote it directly to a retail

8   agency.

9        Q    Then as a result of that, the next chain was

10  within hours.  Mr. Chen then submitted that to

11  Jeannette to review the risk.

12            Are you familiar with Jeannette Guercio?

13       A    I am not.

14       Q    Have you ever dealt with her?

15       A    No.

16       Q    Have you dealt with Kui before?

17       A    Yes.

18       Q    The next e-mail is over on page 3.  Ms.

19  Guercio wrote back to Kui asking questions like why

20  is the account being non-renewed?  What are the

21  rates and terms?  And asked her to confirm -- asked

22  him to confirm some information about mortgages, tax

23  payments, a central station automatic sprinkler

24  system, and is building free of combustibles.

25            It looks like that e-mail was forwarded to

Page 13

1    you and you responded; is that correct?

2        A    Correct.

3        Q    And the response was on August 13th about

4    five days later; is that correct?

5        A    I believe it's August 18th.

6        Q    Okay.  And then just read out here what you

7    indicated in your e-mail, please.

8        A    "Hi, Kui, it's being non-renewed because

9    it's vacant.  I don't have any property terms yet,

10   but the GL has been quoted already for around 2800.

11   Agent says confirmed.  All mortgage and tax payments

12   are current, yes.  Central station automatic

13   sprinkler system will remain operational during

14   vacancy.  Yes.  If building free of all

15   combustibles.  Yes."

16       Q    Where did you get the information that

17   mortgage and tax payments were, in fact, current?

18       A    That was e-mailed to me by, I believe it was

19   Donna from Shomer Insurance Agency again.

20       Q    With regard to the central station sprinkler

21   system, she gave you that information as well?

22       A    Yes.

23       Q    That the building was free of combustibles,

24   she gave that to you?

25       A    Correct.

Page 14

```
1        Q     Now, did at any time Donna indicate to you

2   that the insured was in bankruptcy and had been in

3   bankruptcy since May 26th of 2009, some year and a

4   half earlier?

5        A     No.

6        Q     Does your application, does the commercial

7   application have any reference to that question?

8        A     Yes.

9        Q     And what does that -- in response to the

10  question of whether there had been any bankruptcies

11  filed by the applicant, which would have been

12  Fairfield Shopping Center, LLC, within the last five

13  years, did the application have yes or no?

14       A     No.

15       Q     If in fact -- this is a hypothetical, if

16  they had filed bankruptcy on May 26th, 2009 and were

17  in bankruptcy as of the date of the submission of

18  this application, would that answer have been

19  correct or incorrect?

20       A     The answer would have been incorrect.

21       Q     In your experience -- I didn't ask you this,

22  but how long have you been in the insurance

23  industry?

24       A     Since November of 2000.

25       Q     Based upon your experience in the insurance
```

Page 15

1   industry, if an insured answers that question that

2   they were in bankruptcy, what has been your

3   experience with regard to the ability or insurance

4   company's ability to underwrite the risk?

5       A    It makes it slightly more difficult, but not

6   impossible.  So I would say maybe just a ballpark,

7   half the companies that could consider it on a good

8   day would decline it because of that bankruptcy

9   answer.  It's not impossible to get done, but then

10  again, it doesn't make my life easier to try to

11  place one like this.

12      Q    And if they do answer truthfully and say

13  that they were in bankruptcy, those roughly half who

14  would take it -- sometimes they take on the risk but

15  charge a higher premium for that?

16      A    Correct.

17      Q    Do you happen to know the policy of American

18  Safety Insurance Company with regard to their

19  underwriting policies on bankruptcies?

20      A    No.

21      Q    If you go to page 3 of that application.

22  Under the property section, if you'll look down at

23  the bottom, there is a series of blocks dealing with

24  burglar alarms.  Do you see that?

25      A    Yes.

Page 16

1     Q     They ask -- can I come around beside you,
2     please?
3     A     Sure.
4     Q     The application asks for such things as the
5     type of burglar alarm, certificate number,
6     expiration dates, extent, grade, whether there's
7     central station, with keys.  And then there's a
8     burglar alarm installed and serviced by, form, the
9     number of guards, watchmen, whether they clock
10    hourly or et cetera.
11          And as you reviewed that application for
12    insurance, were those forms filled out?
13    A     Yes.
14    Q     And how were they filled out?
15    A     They were filled out noting that the
16    location had fire extinguishers and smoke alarms.
17    It noted that the locations were 100 percent
18    sprinklered and contained a central station.
19    Q     But with regard to a burglar alarm, which is
20    different from a --
21    A     I'm sorry.
22    Q     -- fire premises, it was blank?
23    A     It was blank, correct.
24    Q     As a wholesale broker, how do you interpret
25    an application when it comes in with a blank in

                                              Page 17

1   there?

2       A    We don't necessarily interpret it that they

3   do not have the burglar alarm.  A lot of these

4   questions are generally left blank, or sometimes at

5   the time of completing the application they just

6   don't know the answer.

7            So when we typically get the submission and

8   we get it out to various companies that can consider

9   it, if carriers have various questions on what they

10  see in front of them, they'll subsequently ask me

11  that.  Whether it's something that pops up in their

12  mind while they're checking out the building or if

13  there's something blank on the app, they'll come

14  back and ask subsequently.

15      Q    And that's what happened in this instance?

16      A    Correct.

17      Q    If you go back to the e-mails again.  Kui

18  sent the information that you had submitted to

19  Jeannette Guercio.  Jeannette then wrote back saying

20  some information about "Prior to quoting, please get

21  a fac quote for X/S 3MM."  What does that mean, sir?

22      A    If you notice, that's an internal e-mail

23  between her and Kui.  But it looks like she's

24  authorizing him to quote this account.  Fac means

25  facultative reinsurance, which means American Safety

                                        Page 18

```
1    Indemnity Company probably had to get a reinsurance
2    quote to be able to offer to me.  But this is
3    basically outlining the authority to Kui to be able
4    to quote this account to me.
5        Q    What authority was Kui given with regard to
6    theft losses?
7        A    He was advised to exclude theft.
8        Q    The quotation was, "Okay to quote special,
9    excluding theft"?
10       A    Correct.
11       Q    And then some additional items.  Item No. 4
12   said, "Warrant applicable protective safeguards."
13   What is that, sir?
14       A    I believe American Safety has a form within
15   their policy that warrants various safeguards that
16   are outlined in the application.  Basically saying,
17   if you told us that you have a fire extinguisher,
18   the endorsement will say your policy warrants that
19   you have a fire extinguisher because you told us you
20   did.
21       Q    Take a look at Exhibit 1, page 2.  Is that a
22   copy of the endorsement regarding the protective
23   personal safety warranty?
24       A    Yes.
25       Q    Does it have a reference in there about a
```

Page 19

1    checkmark on whether the property should be secured.

2    And can you read the checkmark for me?

3         A    Sure.  "Premises locked and secured against

4    unauthorized entry."

5         Q    Does it have an entry with regard to the

6    fire protection?

7         A    It does.

8         Q    And does it have one with regard to the

9    burglar alarm?

10        A    Yes, it does.

11        Q    What does it say about the burglar alarm?

12        A    "Burglar alarm including central station

13   supervisory service therefore."

14        Q    Now, I'll represent to you that this form

15   that you're looking at was indeed made a part and

16   formed the basis of the insurance policy in this

17   instance.

18        A    Correct.

19        Q    What is the significance of a warranty like

20   this?

21        A    Basically, this warranty is, A, confirming

22   what the application says; and B, basically telling

23   the insured, you only have coverage if you have

24   these protective safeguards.

25        Q    So if those protective safeguards are not

Page 20

1    met, does that mean they do not have coverage?

2         A     Potentially.

3         Q     Let's go back to your e-mails.  Based upon

4    the authority that Kui was giving, he sent you an

5    e-mail and then you responded on August 19th.  And

6    your e-mail states, "Rate seems great, but why no

7    theft?"  Do you see that?

8         A     Yes.

9         Q     And then he wrote back that same day, "No

10   security protection, no theft, period.  Period.

11   Period."

12              And then I want to highlight the e-mail at

13   the very top dated September 13th, 2010.  First of

14   all, I note there's a gap in time of August the 19th

15   to September 13th.

16              Do you have any recollection as to what

17   action you took between August 19th and September

18   13th to get answers to those questions?

19        A     I most likely proposed directly to Donna at

20   Shomer Insurance, probably in the manner, I have an

21   American Safety quote, or here's the American Safety

22   quote, they can consider providing theft coverage if

23   you can confirm a central station burglar alarm.

24              And the gap in time was probably me just

25   waiting for an answer.  The effective date didn't

Page 21

1    come till September 15.  And we generally always

2    work till the last minute on these type of accounts.

3    So I probably was just waiting for an answer.

4         Q    So the response that you sent to Kui on

5    Monday, September 13th at 12:04 P.M. was as

6    follows -- and I'm reading from your e-mail:  "Agent

7    confirmed."  And then underscored and in bold, "They

8    do have a central station burglar alarm."

9              And then the question, "Can I please get

10   formal quote, including theft.  Thanks, Steven

11   Riss."  Is that correct?

12        A    Correct.

13        Q    Did I read that --

14             Did you speak with Donna Ratliff or did you

15   speak with anybody else at Shomer?

16        A    Donna Ratliff sent me an e-mail confirming

17   this.

18        Q    Do you happen to have a copy of that e-mail

19   in your files somewhere?

20        A    I do.

21        Q    Have you had a chance to look at it before

22   your examination under oath today?

23        A    I did.

24        Q    Can you tell us, to the best of your

25   recollection, what the e-mail said.  Let me ask you

Page 22

```
 1    just a few questions.
 2           Do you know the date of the e-mail?
 3    A     I don't remember it offhand, but most
 4    likely, it was probably Monday, September 13 because
 5    I don't let these answers sit.  I don't have time --
 6    Q     Sure.
 7    A     -- to sit on these answers.
 8           When I get them, I send them off to my
 9    underwriting.  I would say probably within the hour.
10    Easily within the day.
11    Q     Can you sort of paraphrase, as best you can
12    recall, what the e-mail said?
13    A     It's verbatim.  "They do have a central
14    burglar alarm."  I cut and pasted Donna's answer
15    into an e-mail to Kui.
16    Q     It was underscored and bolded?
17    A     I probably did that to differentiate it
18    between my e-mail and what the agent actually said.
19    I probably could have put it in quotation marks but
20    it is what it is.  I cut and pasted.  "They do have
21    a central burglar alarm" verbatim in an e-mail.
22    Q     As a result of the representation that was
23    made to you that you made to American Safety, an
24    insurance policy was issued?
25    A     An insurance quote was issued.
```

Page 23

1      Q      Quote.

2      A      Yes.

3      Q      And then was a binder -- did a binder

4    follow?

5      A      Yeah.   We received the quote.   We received

6    an order to bind.   We bound the account and Kui or

7    someone at American Safety subsequently sent me a

8    binder.

9      Q      Is the first page the commercial package

10   binder?

11     A      Yes.

12     Q      And eventually an insurance policy was

13   issued?

14     A      Yes.

15     Q      There was a document that we have talked

16   about labeled Exhibit 24.   Would you take a look at

17   that, please.

18     A      Yes.

19     Q      We discovered this document yesterday when

20   we were taking the examination under oath of Yair

21   Ben-Moshe.

22            Have you ever seen a form -- first of all,

23   do you know the name of this entity on the top, W --

24     A      -- KF&C.

25     Q      What does that stands for?   If you know.

Page 24

1        A      I don't know.   I don't know.   The WKF&C is
2    one of the nation's largest MGAs, managing general
3    agencies.   Then AmWINS, we access to obtain quotes
4    on behalf of clients.   So it's in the similar vein
5    as American Safety.   We go to American Safety, get
6    an American Safety quote.   We can go to WKF&C, and
7    they retain various carriers that they can offer.
8    They have a Chubb paper.   They have an Endurance
9    paper, an Aspen U.K. paper.
10            They're not an insurance company.   They
11   represent multiple insurance companies.   So when you
12   send them an account to look at, they have various
13   carriers that can offer various products, general
14   liability, property, earthquake, professional
15   liability.
16            So WKF&C, it's actually funny because Kui
17   used to work at WKF&C.   But WKF&C has their own
18   applications.   And this one, I usually keep on file.
19   A lot of people keep on file, because it's very
20   simple.   It's one page.   It's not ten pages.
21            So a lot of retail agencies keep these blank
22   applications ready to be completed, because it
23   answers a lot of good information about various
24   accounts, in this case vacant properties.
25            So WKF&C -- getting a WKF&C app is not

                                                    Page 25

1    unheard of.  A lot of people use it.

2         Q     On the very bottom of the app, it looks like

3    it has Donna Ratliff's name on it?

4         A     Uh-huh, yes.

5         Q     Do you recognize her signature?

6         A     I can't say yes or no.

7         Q     Fair enough.

8         A     I rarely see something signed in general but

9    it says Donna Ratliff.

10        Q     Parenthetically, do you happen to be know

11   where Ms. Ratliff may be employed or --

12        A     No.

13        Q     In this particular instance, there's no date

14   on this.  We did not find a date.  Is this the first

15   time you've seen this particular form filled out in

16   conjunction with this particular placement?

17        A     I'd have to go back through my e-mails.

18   It's very likely this application was given to me in

19   conjunction with this ACORD application to be

20   submitted to various carriers, including American

21   Safety.  I'd have to go back to my initial

22   submission to Kui dated August 13th.  It may have

23   been included in that submission.  I just can't

24   remember offhand.

25        Q     If it was part of the original submission,

Page 26

1    it makes reference to a central station burglar

2    alarm?

3         A    Correct.

4         Q    Your original submission was in August 13th?

5         A    Yes.

6         Q    If you'll go to page 4.  Isn't it August

7    13th?

8         A    Yes, 2010.

9         Q    2010.

10        A    Yes.

11        Q    I'm just thinking and rationalizing with you

12   here, if it was part of the original application,

13   then if the question came in about security, you

14   would have had the answer already, wouldn't you?

15        A    Yes.

16        Q    So is it possible that maybe the Shomer

17   agency submitted an application to you, which is

18   Exhibit 14, that you went to American Safety on and

19   may at the same time have submitted an application

20   to WKF&C to see if they could shop it for some other

21   company.  So in a sense, could the two of you have

22   been competing for the business?

23        A    Shomer and I do not compete for business.

24        Q    I don't mean Shomer.  I mean you and WKF&C.

25        A    When you say me and WKF&C.  Shomer does not

Page 27

1    access WKF&C.  I access WKF&C.

2         Q    I see.

3         A    So they sent it to me and I can guarantee I

4    sent it to both WKF&C and American Safety, and

5    various other markets.  Again, if I sent it to ten

6    markets, WKF&C and American Safety were definitely

7    on my short list.  My list of ten, yes.

8         Q    Well, Donna Ratliff in this form said that

9    there was a central alarm -- there was a burglar

10   alarm with a central station monitoring, and

11   confirmed that to you in an e-mail?

12        A    Correct.

13        Q    That there was a -- let's see the exact

14   language.  They do have a central station burglar

15   alarm.

16        A    Correct.

17        Q    Now, just so I understand it and we're

18   speaking on the same thing.  A burglar alarm is

19   alarm that is -- protects the interior and has

20   either an alarm or gong when the windows or doors

21   are breached?

22        A    Correct.

23        Q    It also has a line that contacts some

24   central station or some offsite station to let them

25   know the break-in has occurred?

Page 28

1    A    Correct.

2    Q    In your experience, and I'm not a burglar

3  alarm specialist, is this done by a telephone line?

4    A    I'm not an expert either, but when we talk

5  burglar alarms, it has to be a central station.

6  Whatever that entails, a burglar alarm that just

7  rings a bell is not sufficient enough in the

8  insurance world.

9    Q    Right.

10    A    So I believe it's some sort of line,

11  telephone line, that will alert, I don't know, fire,

12  police, a burglar monitoring company, who probably

13  in turn notifies the police or such, in that vein.

14  But, again, I'm not an expert either in the alarm

15  industry.

16    Q    Now, you, Steve Riss, and AmWINS, never have

17  been to this property?

18    A    Correct.

19    Q    You don't know if there was a burglar alarm

20  with a central monitoring, whether it was

21  functional, operational, you have no knowledge about

22  that?

23    A    Correct.

24    Q    You were simply given information,

25  representations from the agent, and then you in turn

Page 29

1    passed that along to American Safety Indemnity

2    Company?

3         A    Correct.

4         Q    You were the conduit through?

5         A    Correct.

6         Q    That's all the questions I have at this

7    time, sir.

8         A    Thank you.

9              MR. ROWE:  I have a few.

10

11                        EXAMINATION

12   BY MR. ROWE:

13        Q    As the wholesale insurance broker, as I

14   understand your testimony, you would work with

15   clients like Shomer Insurance Agency for risks that

16   they couldn't place themselves?

17        A    Correct.

18        Q    And in your experience, is a vacant building

19   coverage one of the risks that's harder to place

20   than if a building's occupied?

21        A    Correct.

22        Q    And in this case, there's no dispute that

23   the building was vacant in Birmingham?

24        A    Correct.

25        Q    And they came to you to ask your help in

Page 30

```
 1    placing the coverage?
 2         A    Correct.
 3         Q    And what kind of coverage did they want to
 4    place?
 5         A    General liability and property.
 6         Q    Did they want theft coverage also?
 7         A    Correct.
 8         Q    When you went to your market, did you
 9    submit -- did you shop this risk to various
10    companies in the market?
11         A    Yes.
12         Q    Didn't just go to American Safety?
13         A    Correct.
14         Q    Is American Safety a surplus lines carrier?
15         A    Yes.
16         Q    What does that mean?
17         A    They have -- in the State of California, the
18    insurance company, American Safety, has non-admitted
19    paper, that's the way we call it, basically they're
20    not domiciled in California.  And to be able to
21    write in the State of California, they have to
22    basically, without a better word, they have to pay
23    California to write in the state.  And that's done
24    by charging a surplus lines tax that the enduser and
25    the insured will pay in conjunction with their
```

Page 31

     1    insurance policy.  In turn, American Safety is
     2    allowed to write in the state.
     3             Since they're not a domiciled company within
     4    the state, they're considered a surplus-lines type
     5    carrier.  They're not -- they're not subject to
     6    California law, without a better sense of the world,
     7    without being a non-admitted carrier.
     8        Q    In this case the risk was in Alabama.  But I
     9    think Alabama law sounds the same as California.
    10        A    That is correct.  I apologize.  This risk
    11    was in Alabama.  Yes, they are non-admitted in
    12    Alabama as well.
    13        Q    So for a non-admitted carrier like ASI to be
    14    able to write a risk, is it fair to say that the
    15    domestic lines don't offer cover for that risk?
    16        A    Yes.
    17        Q    By nature of the beast, surplus lines only
    18    write more risky coverage?
    19        A    Correct.
    20        Q    Has that been your experience in the
    21    industry?
    22        A    Correct.
    23        Q    And they charge premiums to reflect it's
    24    more risky?
    25        A    Yes.

                                                  Page 32

1    Q    In this case we have a vacant building in

2  Birmingham, Alabama.   Everyone recognizes it's

3  vacant at the time when you're asking for quotes,

4  correct?

5    A    Correct.

6    Q    Is it the decision of the insurer whether to

7  inspect the risk before they bind the coverage?

8    A    When you say inspect before binding, they

9  will not go in and inspect it before they bind it.

10  If they choose to inspect it subsequently within the

11  policy term, they usually will either charge an

12  inspection fee or tell you, this risk is subject to

13  inspection, whether it's on a quote or a binder.

14    Q    Would it be their right to inspect the risk

15  before they bound coverage if they so chose?

16    A    Absolutely.

17    Q    Is that something that happens from time to

18  time?

19    A    Absolutely.   Underwriters, like in this

20  case, Kui, when they get information, it's their

21  right to do their own research before offering any

22  terms and conditions.

23    Q    And the underwriter in this case was a man

24  named Kui?

25    A    Yes.

1       Q    Is that his first name or last name?

2       A    First name.

3       Q    What's his last name?

4       A    Chen.

5       Q    Is he an employee of ASI?

6       A    Correct.

7       Q    He would have had the right to inspect the

8    property if he chose to do so or hire someone to do

9    it?  I know he wouldn't go do it but he could hire

10   somebody to go by and look at the property if he

11   wanted to before you put ASI on the risk?

12      A    Correct.

13      Q    And he certainly had the right to do that

14   after he bound the risk?

15      A    Correct.

16      Q    And, likewise, with the application here,

17   the copy that we've got in front us, what's the

18   number on it?  I can't see it.

19      A    Exhibit 14.

20      Q    Exhibit 14 to another deposition.

21           That application's not signed by the

22   insured, right?

23      A    Correct.

24      Q    If ASI wants to have an application that's

25   signed by the insured, is that their right to do so?

Page 34

1      A     Correct.

2      Q     And, in fact, is it typical to get an

3   application signed by the insured?

4      A     Yes.

5      Q     If the insurance company decides to proceed

6   without a signed application, that's their decision?

7      A     Correct.

8      Q     And if they proceed without a signed

9   application, they're proceeding at their own risk,

10  aren't they?

11     A     Correct.

12     Q     In this case, the application says nothing

13  about whether or not this property has a burglar

14  alarm, right?  Those parts to the application are

15  blank?

16     A     Correct.

17     Q     Now, in the documents that Mrs. Futter, the

18  attorney for Ben-Moshe, has given us some documents

19  on behalf of Fairfield and Ben-Moshe, and that's

20  where we got a lot of these.  Do you know Cynthia

21  Futter?

22     A     No.

23     Q     Among the documents that she gave us was the

24  WKF&C form that's been filled out that's Exhibit 21

25  to the Ben-Moshe deposition which you got in your

                                      Page 35

```
 1    hand, right?
 2         A    Correct.
 3         Q    As I understand your testimony, that's a
 4    form that is commonly used in this market by people
 5    who are dealing with vacant property?
 6         A    Correct.
 7         Q    So it doesn't necessarily mean that the
 8    WKF&C was even involved, it's just a blank form that
 9    you maintain on your computer?
10         A    Correct.
11         Q    And other people maintain on their computer?
12         A    Correct.
13         Q    And here it looks like Donna Ratliff signed
14    it?
15         A    Correct.
16         Q    And it's all filled in, right?
17         A    Correct.
18         Q    Indicates that the date of last occupancy
19    was June 1st, 2010 of this building in Birmingham --
20         A    Correct.
21         Q    -- right?
22              And it's got Fairfield Shopping Center, LLC,
23    right?
24         A    Correct.
25         Q    And it indicates that the utilities are
```

Page 36

```
 1    operational?

 2         A     Correct.

 3         Q     And indicates the building's locked and

 4    alarmed?

 5         A     Correct.

 6         Q     It's a commercial neighborhood?

 7         A     Correct.

 8         Q     It's got valuation figures on it for the

 9    building and square footage?

10         A     Correct.

11         Q     Got the date of purchase, 2006?

12         A     Correct.

13         Q     It has information about whether the real

14    estate taxes are paid?

15         A     Correct.

16         Q     Or whether the mortgage obligation is up to

17    date?

18         A     Correct.

19         Q     Whether there are liens against the

20    property?

21         A     Correct.

22         Q     And it also says:  "Is the insured in

23    bankruptcy?"  And it's got information "no" on that?

24         A     Correct.

25         Q     It's got loss information there.  "Any
```

                                              Page 37

```
 1   losses within the past 36 months?"  It says "no" on
 2   that, right?
 3       A    Correct.
 4       Q    According to that form, is there a burglar
 5   and fire and central station alarm?
 6       A    Yes.
 7       Q    Is Ms. Ratliff the person that you were
 8   dealing with at the Shomer Insurance Agency in
 9   placing this risk?
10       A    Yes.
11       Q    So all the information you received from the
12   Shomer Agency came through Ms. Ratliff, right?
13       A    Correct.
14       Q    And is the information that is contained on
15   Exhibit 21 consistent with the information that you
16   provided to the insurance company?
17       A    Yes.
18       Q    And I think you were asked this question but
19   maybe I'll ask it again, maybe a little different.
20            Do you know whether or not Ms. Ratliff gave
21   you this form as a part of the placement of this
22   coverage?
23       A    I'm not certain.
24       Q    And whether it was a part of the original
25   application or supplemented later, you're not sure
```

                                                    Page 38

1    whether you have it or not?

2        A    Correct.

3        Q    Do you still have your file on this matter?

4        A    Yes.

5        Q    So that's something that we could find out?

6        A    I believe I do have this app because more --

7    most likely I gave Donna at Shomer Insurance this

8    blank application.

9        Q    That's a form you use?

10       A    Yes.  So I -- I'm pretty certain I gave her

11   the blank one.  She completed it and gave it back to

12   me.

13       Q    And would you have sent it on to the

14   insurance company?

15       A    I would have, yes.  If I did receive it,

16   yes.

17       Q    And is it common for you to supplement

18   applications with material that the insurance

19   company wants to know?

20       A    Yes.

21       Q    Such as this?

22       A    Yes.

23       Q    So it wouldn't be uncommon for you to get

24   this form later in the process and then submit it to

25   the insurance company?

                                            Page 39

```
 1        A     Later in the quoting process, correct.
 2        Q     And, in fact, the form indicates that it is
 3   in addition to the ACORD property application,
 4   right?
 5        A     Correct.
 6        Q     Well, I know that both of us Steves over
 7   here would like for you, if it's not too much
 8   trouble, to give us a copy of material in your
 9   application file, because we're very interested in
10   whether you have this document.
11              Would that be something you would do?
12        A     Sure.
13        Q     I suspect Steve Kyle will ask you to do that
14   or I will ask you to do that.
15              MR. KYLE:  We'll do it together.  That's
16   fine.  Agreed.
17   BY MR. ROWE:
18        Q     In any case, we've got the e-mail chain
19   where they're asking you for this information,
20   whether you had that particular form or whether you
21   had the e-mail that you described to Mr. Kyle, you
22   definitely got information from -- what's her name?
23              MR. KYLE:  Donna Ratliff.
24   BY MR. ROWE:
25        Q     Donna Ratliff.  That there was a central
```

                                              Page 40

```
 1    station -- there was a burglar alarm with a central
 2    station monitor and you passed that information on
 3    to ASI?
 4         A    Correct.
 5         Q    And they wrote a policy that included theft?
 6         A    Correct.
 7         Q    When there was a claim made on this policy
 8    did you have any part in that?
 9         A    We process the claim to American Safety.  We
10    literally forwarded on the e-mail that we received
11    of the notice on to American Safety claims.
12         Q    So when the ACORD form for the loss was
13    filled in by Shomer, did it come to you?
14         A    Yes.
15         Q    And then you sent it to American Safety?
16         A    Correct.
17         Q    And did you know later that they amended the
18    ACORD form -- were you on that e-mail chain?
19         A    Who is "they"?  I'm sorry.
20         Q    Shomer.
21         A    I'm not aware of that.
22         Q    Where is that e-mail chain?
23         A    Oh.  Oh.  Okay.  You say amended the ACORD
24    form -- the notice of claim ACORD form?
25         Q    Yes.
```

Page 41

1      A    Yes, I'm aware.

2      Q    And you're on that e-mail?

3      A    Yes.

4      Q    I'm referring to Exhibit 3.

5      A    I thought you were talking about the ACORD

6   submission.

7      Q    So the original ACORD submission came to you

8   and you forwarded it on to ASI, correct?

9      A    Correct.

10      Q    And then when the date of loss was amended

11   by Dora Sher of the Shomer Insurance Agency, this is

12   Exhibit 3 to the deposition of Joseph Schneerson,

13   you were copied on that e-mail, correct?

14      A    Correct.

15      Q    Now, on the question of if the -- if the

16   application had indicated that Fairfield was in

17   bankruptcy, it's my understanding from your

18   testimony that you said it's slightly more difficult

19   to get coverage but not impossible?

20      A    Correct.

21      Q    So is it a matter of the premium might have

22   increased a bit or what's the difference?

23      A    It wouldn't necessarily be an increase in

24   premium.  It's likely it would be but a lot of --

25   the different companies have different treaties,

Page 42

1   different rules and regulations on what they can and

2   cannot quote.  So when an account -- when an insured

3   is in bankruptcy, that may just raise a red flag, we

4   cannot quote that, period.

5          Other carriers may say, we can quote it,

6   doesn't matter one way or another.  Other carriers

7   may say, yeah, we can quote it, but we have to

8   charge more for it.

9      Q    Were you involved with the placement of

10  coverage before the ASI coverage on this building?

11     A    No.

12     Q    On this transaction AmWINS' client is the

13  Shomer Insurance Agency?

14     A    Yes.

15     Q    You don't have binding authority with ASI?

16     A    Correct.

17     Q    And did you supply ASI with all the

18  information concerning this risk that they asked for

19  before they bound the risk?

20     A    I believe so.

21     Q    Thank you, sir.

22

23                    FURTHER EXAMINATION

24  BY MR. KYLE:

25     Q    Mr. Riss, I just have a few clarifying

                                          Page 43

```
 1   questions, we'll be finished.
 2            It seems that what you've helped develop is
 3   on two occasions, if your recollection is correct,
 4   that Shomer Insurance Agency is acting as the agent
 5   and representative for Fairfield Shopping Center,
 6   LLC, represented that there was a burglar alarm with
 7   a central monitoring system?
 8        A    Correct.
 9        Q    They did it in the WKF&C form and they did
10   it through an e-mail, Ms. Ratliff did it in two
11   forms?
12        A    Correct.
13        Q    And you in turn took the information and
14   forwarded it along to American Safety for their
15   consideration by their underwriting department?
16        A    Correct.
17        Q    And it was anticipated that they would rely
18   upon these representations as being true and
19   correct?
20        A    Correct.
21        Q    If it turns out that it was incorrect, that
22   there was not a burglar alarm with a central
23   monitoring system, despite the two comments, if it
24   turned out there wasn't, that would be a material
25   and significant misrepresentation, wouldn't it?
```

Page 44

1     A     Correct.

2     Q     The policy was put into place.  It contained

3  a form in the insurance industry that's referred to

4  as a protective safeguard promissory warranty,

5  correct?

6     A     Correct.

7     Q     And you've seen these forms before?

8     A     Correct.

9     Q     They're not uncommon?

10    A     Correct.

11    Q     They state that "It's understood and agreed

12  by the insured that it is a condition precedent to

13  the acceptance of this insurance and the payment of

14  any claim under the policy that the insured warrants

15  that at all times during the currency of the policy,

16  that the premises described is protected by the

17  protective safeguard described in the schedule,"

18  correct?

19    A     Correct.

20    Q     So this is an ongoing promise --

21    A     Correct.

22    Q     -- by the insured?

23          It means that as of the date of inception of

24  the policy and throughout the life of the policy,

25  that there shall be a burglar alarm with a central

Page 45

1    monitoring system in place?

2        A    Correct.

3        Q    Hypothetically, if it starts with a burglar

4    alarm and a month into it the burglar alarm is

5    discontinued or ceases to operate or they take it

6    away, that would be a violation of this protective

7    safeguard promissory warranty?

8        A    Correct.

9        Q    If the premises were not locked during the

10   pendency of the policy period, that would be a

11   violation and a breach of the protective safeguard

12   promissory warranty?

13       A    Correct.

14       Q    If it was not secured against unauthorized

15   entry or any of the other checkmarks on the

16   schedule, that would be a breach of the protective

17   safeguard promissory warranty?

18       A    Correct.

19       Q    And it could potentially -- I'm not going to

20   ask you for a legal opinion, but it could

21   potentially void coverage?

22       A    Correct.

23       Q    Do you advise your clients that if they

24   don't do this, that it will void coverage and they

25   should not do these things?

Page 46

1        A     Correct.

2        Q     I think that's all I have.

3

4                        FURTHER EXAMINATION

5    BY MR. ROWE:

6        Q     I represent GE, which is the mortgage holder

7    in this case.  And they're listed as an additional

8    insured in this policy.  Were you aware of that?

9        A     Yes.

10       Q     Does the insurance company here, ASI, have

11   separate obligations to the mortgage holders under

12   its policy?

13       A     I'm sorry, does it what?

14       Q     Have separate and distinct obligations to

15   the mortgage holder under this policy?

16       A     Yes.

17       Q     And those obligations, you would expect

18   would be set out in the policy?

19       A     Correct.

20       Q     Those obligations would be different than

21   the obligations that it owes to its insured?

22       A     Yes.

23       Q     Thank you, sir.

24             MR. KYLE:  That's all we have.  Thank you,

25   Mr. Riss.

                                          Page 47

1          I'll mention one thing to you, what we've

2     said to the other witnesses.  You have an

3     opportunity to read this examination under oath when

4     it has been transcribed to see if everything you

5     said was transcribed correctly by this court

6     reporter.

7          You can prepare an errata sheet and change

8     anything, if she didn't take it down properly, or

9     you can waive that right.  That is something we just

10    offer to you and you can make the choice.

11         THE WITNESS:  I would like to review it.  I

12    would like to have my legal people review it as

13    well.

14         MR. KYLE:  Sure.  That would be a good idea.

15    I think that's proper to do.

16         We will send -- she has the address, she'll

17    send it to that address.

18         Would 30 days be sufficient to look at it?

19         THE WITNESS:  Absolutely.

20         MR. KYLE:  We normally ask it to be done

21    within 30 days.  There's an errata sheet.  If

22    there's something that needs to be changed, if you

23    meant to say something else and you said something,

24    or if she typed it wrong, you'll correct it.

25    Oftentimes, most of the times, there's no changes

Page 48

1   and you simply sign it.  You can sign it before any
2   notary public.
3              THE WITNESS:  Understood.
4              MR. KYLE:  I'm sure there's one around your
5   company that can do that.
6              THE WITNESS:  Yes.
7              MR. KYLE:  You don't have to do it before
8   her.  And then just take it and send it back to her.
9   She'll send a self-addressed stamped envelope.  Put
10  it in that envelope and send it back to her.  Okay?
11             THE WITNESS:  Not a problem.
12             MR. KYLE:  Good.  Thank you, sir.
13             (TIME NOTED:  12:15 P.M.)
14
15
16
17
18
19
20
21
22
23
24
25

                                            Page 49

1          I declare under penalty of perjury

2   under the laws of the State of California

3   that the foregoing is true and correct.

4          Executed on _____, 2012,

5   at _____, California.

6

7

8                   _____

9                   SIGNATURE OF THE WITNESS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    STATE OF CALIFORNIA    ) ss:
 2    COUNTY OF LOS ANGELES )

 3

 4            I, CATHRYN L. BAKER, C.S.R. No. 7695, do
 5    hereby certify:
 6            The the foregoing examination under oath of
 7    STEVEN D. RISS was taken before me at the time and
 8    place therein set forth, at which time the witness
 9    was placed under oath by me;
10            That the testimony of the witness and all
11    objections made at the time of the examination were
12    recorded stenographically by me, were thereafter
13    transcribed under my direction and supervision and
14    that the foregoing is a true record of same.
15            I further certify that I am neither
16    counsel for nor related to any party in said action,
17    nor in any way interested in the outcome thereof.
18            IN WITNESS WHEREOF, I have subscribed
19    my name this 3rd day of May, 2012.

20

21

22    _____

23    Cathryn L. Baker, C.S.R. No. 7695

24

25
```

Page 51

[& - application]

**&**

**&**   3:4

**1**

**1**   1:25 4:12 11:5,9
  11:12 19:21
**100**   17:17
**1000482-10**   6:22
**11**   4:14
**1100**   3:16
**11:25**   5:2
**11:26**   2:14
**12:04**   22:5
**12:15**   2:15 49:13
**13**   4:12 11:19 23:4
**13th**   14:3 21:13,15
  21:18 22:5 26:22
  27:4,7
**14**   9:7 12:4 27:18
  34:19,20
**141218c**   1:24
**15**   7:1,1 22:1
**18**   1:13 2:15 5:1
**18th**   14:5
**19867**   7:6
**19th**   21:5,14,17
**1st**   36:19

**2**

**2**   8:25 19:21
**200**   3:6
**2000**   15:24
**2006**   37:11
**2009**   15:3,16
**201**   6:22
**2010**   4:13 7:1 10:8
  12:12 21:13 27:8,9
  36:19
**2011**   7:1
**2012**   1:13 2:15 5:1
  50:4 51:19
**205**   3:18
**2094**   5:7
**21**   35:24 38:15

**2100**   3:15
**24**   24:16
**250**   7:6
**250-5000**   3:18
**26th**   15:3,16
**2800**   14:10

**3**

**3**   13:18 16:21 42:4
  42:12
**30**   4:7 48:18,21
**30338-2668**   3:8
**35203-3367**   3:17
**36**   38:1
**3mm**   18:21
**3rd**   51:19

**4**

**4**   11:14 19:11 27:6
**4/17/12**   5:21
**43**   4:6
**47**   4:7

**5**

**5**   4:6 11:14,15
**500**   3:7 6:24
**51**   1:25

**6**

**668-0878**   3:9

**7**

**7695**   1:23 2:17 51:4
  51:23
**770**   3:9

**8**

**835**   2:13

**9**

**90004**   6:25
**91311**   7:7

**a**

**a.m.**   2:14 5:2
**ability**   16:3,4
**able**   19:2,3 31:20
  32:14

**absolutely**   33:16,19
  48:19
**acceptable**   6:15
**acceptance**   45:13
**access**   7:25 25:3
  28:1,1
**account**   8:23 13:20
  18:24 19:4 24:6
  25:12 43:2
**accounts**   7:23,23 8:5
  22:2 25:24
**acord**   26:19 40:3
  41:12,18,23,24 42:5
  42:7
**acting**   44:4
**action**   21:17 51:16
**adams**   3:13
**addition**   40:3
**additional**   19:11
  47:7
**address**   6:24 7:5
  48:16,17
**addressed**   49:9
**administered**   5:6
**admitted**   31:18 32:7
  32:11,13
**advise**   46:23
**advised**   19:7
**agencies**   25:3,21
**agency**   9:2 10:1,13
  12:17 13:5,6,8
  14:19 27:17 30:15
  38:8,12 42:11 43:13
  44:4
**agent**   7:12 8:14 9:22
  14:11 22:6 23:18
  29:25 44:4
**agents**   7:17,24
**agreed**   6:9 40:16
  45:11
**aig**   12:21 13:1
**alabama**   3:17 32:8,9
  32:11,12 33:2
**alarm**   17:5,8,19
  18:3 20:9,11,12

21:23 22:8 23:14,21
  27:2 28:9,10,15,18
  28:19,20 29:3,6,14
  29:19 35:14 38:5
  41:1 44:6,22 45:25
  46:4,4
**alarmed**   37:4
**alarms**   16:24 17:16
  29:5
**alert**   29:11
**allowed**   32:2
**amended**   41:17,23
  42:10
**american**   2:12 3:3
  6:3,21 11:1 16:17
  18:25 19:14 21:21
  21:21 23:23 24:7
  25:5,5,6 26:20
  27:18 28:4,6 30:1
  31:12,14,18 32:1
  41:9,11,15 44:14
**amwins**   7:9 9:9,18
  9:20 25:3 29:16
  43:12
**angeles**   1:12 2:14
  5:1 6:25 51:2
**answer**   15:18,20
  16:9,12 18:6 21:25
  22:3 23:14 27:14
**answers**   16:1 21:18
  23:5,7 25:23
**anticipated**   44:17
**anybody**   9:14 22:15
**apologize**   32:10
**app**   18:13 25:25
  26:2 39:6
**appear**   9:13
**appearances**   3:1
**applicable**   19:12
**applicant**   15:11
**application**   9:3,8,11
  9:18 12:3 15:6,7,13
  15:18 16:21 17:4,11
  17:25 18:5 19:16
  20:22 26:18,19

**[application - claims]**

27:12,17,19 34:16
34:24 35:3,6,9,12
35:14 38:25 39:8
40:3,9 42:16
**application's** 34:21
**applications** 25:18
25:22 39:18
**approach** 8:2
**appropriate** 8:8
**april** 1:13 2:15 5:1
**arlaw.com** 3:19
**ashford** 3:6
**asi** 11:18 32:13 34:5
34:11,24 41:3 42:8
43:10,15,17 47:10
**asked** 13:21,21
38:18 43:18
**asking** 6:18 11:20
13:19 33:3 40:19
**asks** 17:4
**aspen** 25:9
**assume** 9:2
**atlanta** 3:8
**attorney** 35:18
**august** 11:18 14:3,5
21:5,14,17 26:22
27:4,6
**authority** 19:3,5
21:4 43:15
**authorizing** 18:24
**automatic** 13:23
14:12
**avenue** 3:15
**aware** 41:21 42:1
47:8

**b**

**b** 20:22
**back** 13:19 18:14,17
18:19 21:3,9 26:17
26:21 39:11 49:8,10
**baker** 1:22 2:16
51:4,23
**ballpark** 16:6

**bankruptcies** 15:10
16:19
**bankruptcy** 15:2,3
15:16,17 16:2,8,13
37:23 42:17 43:3
**based** 15:25 21:3
**basically** 7:22 19:3
19:16 20:21,22
31:19,22
**basis** 20:16
**beast** 32:17
**becoming** 10:6
**beginning** 2:14
**behalf** 2:12 7:18
25:4 35:19
**believe** 10:5 12:22
12:24 13:1 14:5,18
19:14 29:10 39:6
43:20
**bell** 29:7
**ben** 5:20 8:21,22
9:13,16 12:4 24:21
35:18,19,25
**best** 22:24 23:11
**better** 31:22 32:6
**bind** 24:6 33:7,9
**binder** 24:3,3,8,10
33:13
**binding** 33:8 43:15
**birmingham** 3:17
30:23 33:2 36:19
**bit** 42:22
**blank** 17:22,23,25
18:4,13 25:21 35:15
36:8 39:8,11
**blocks** 16:23
**bold** 22:7
**bolded** 23:16
**bore** 12:7
**bottom** 16:23 26:2
**boulevard** 2:13
**bound** 24:6 33:15
34:14 43:19
**bovis** 3:4

**boviskyle.com** 3:10
**breach** 46:11,16
**breached** 28:21
**break** 28:25
**broker** 7:10,12,13
7:14 10:14 13:3
17:24 30:13
**brokerage** 10:14
**brokers** 7:10,15
**building** 10:5,10
12:11 13:24 14:14
14:23 18:12 30:18
30:23 33:1 36:19
37:9 43:10
**building's** 30:20
37:3
**burch** 3:4
**burglar** 16:24 17:5
17:8,19 18:3 20:9
20:11,12 21:23 22:8
23:14,21 27:1 28:9
28:14,18 29:2,5,6
29:12,19 35:13 38:4
41:1 44:6,22 45:25
46:3,4
**business** 3:12 10:15
27:22,23

**c**

**c.s.r.** 51:4,23
**california** 1:12 2:14
5:1 6:25 7:7 31:17
31:20,21,23 32:6,9
50:2,5 51:1
**call** 31:19
**carrier** 31:14 32:5,7
32:13
**carriers** 7:25 8:3,4
18:9 25:7,13 26:20
43:5,6
**case** 25:24 30:22
32:8 33:1,20,23
35:12 40:18 47:7
**casually** 7:22

**cathryn** 1:22 2:16
51:4,23
**ccp** 5:7
**ceases** 46:5
**center** 1:8 2:8 3:6
6:23 8:23 12:7
15:12 36:22 44:5
**central** 13:23 14:12
14:20 17:7,18 20:12
21:23 22:8 23:13,21
27:1 28:9,10,14,24
29:5,20 38:5 40:25
41:1 44:7,22 45:25
**certain** 38:23 39:10
**certainly** 34:13
**certificate** 17:5
**certified** 2:16
**certify** 51:5,15
**cetera** 17:10
**chain** 13:9 40:18
41:18,22
**chance** 22:21
**change** 48:7
**changed** 48:22
**changes** 48:25
**charge** 16:15 32:23
33:11 43:8
**charging** 31:24
**chatsworth** 7:6
**check** 9:15
**checking** 18:12
**checkmark** 20:1,2
**checkmarks** 46:15
**chen** 4:13 11:18,20
13:10 34:4
**choice** 48:10
**choose** 33:10
**chose** 33:15 34:8
**chubb** 25:8
**circumstance** 13:6
**circumstances** 10:4
**claim** 41:7,9,24
45:14
**claims** 41:11

[clarifying - e]

clarifying 43:25
client 43:12
clients 7:14,16 25:4
  30:15 46:23
clock 17:9
cmp 6:22
combustibles 13:24
  14:15,23
come 8:5 10:17 17:1
  18:13 22:1 41:13
comes 6:12,13 17:25
coming 10:1
comments 44:23
commercial 3:12
  12:3 15:6 24:9 37:6
common 39:17
commonly 36:4
communicates 8:15
companies 10:23
  12:24 16:7 18:8
  25:11 31:10 42:25
company 2:13 3:3
  6:22 8:9,12 10:9
  11:1 12:25 13:1
  16:18 19:1 25:10
  27:21 29:12 30:2
  31:18 32:3 35:5
  38:16 39:14,19,25
  47:10 49:5
company's 16:4
compete 27:23
competing 27:22
completed 25:22
  39:11
completing 18:5
computer 36:9,11
concerning 43:18
condition 45:12
conditions 6:20
  33:22
conduit 30:4
confidentiality
  11:15
confirm 13:21,22
  21:23

confirmed 14:11
  22:7 28:11
confirming 20:21
  22:16
conjunction 26:16
  26:19 31:25
consider 11:20,22
  16:7 18:8 21:22
consideration 9:9
  44:15
considered 13:4
  32:4
consistent 38:15
contact 8:17
contacts 28:23
contained 17:18
  38:14 45:2
copied 5:19 42:13
copy 9:8,13 11:6,7,8
  12:2 19:22 22:18
  34:17 40:8
corp 3:12
correct 8:10,16
  10:11,16 11:3 12:8
  12:9 14:1,2,4,25
  15:19 16:16 17:23
  18:16 19:10 20:18
  22:11,12 27:3 28:12
  28:16,22 29:1,18,23
  30:3,5,17,21,24
  31:2,7,13 32:10,19
  32:22 33:4,5 34:6
  34:12,15,23 35:1,7
  35:11,16 36:2,6,10
  36:12,15,17,20,24
  37:2,5,7,10,12,15,18
  37:21,24 38:3,13
  39:2 40:1,5 41:4,6
  41:16 42:8,9,13,14
  42:20 43:16 44:3,8
  44:12,16,19,20 45:1
  45:5,6,8,10,18,19,21
  46:2,8,13,18,22
  47:1,19 48:24 50:3

correctly 48:5
counsel 51:16
county 51:2
course 9:5
court 5:15 48:5
cover 32:15
coverage 20:23 21:1
  21:22 30:19 31:1,3
  31:6 32:18 33:7,15
  38:22 42:19 43:10
  43:10 46:21,24
csr 1:23
currency 45:15
current 12:19 14:12
  14:17
currently 6:2
cut 23:14,20
cynthia 35:20

**d**

d 1:11 2:11 4:4 5:5
  51:7
date 15:17 21:25
  23:2 26:13,14 36:18
  37:11,17 42:10
  45:23
dated 21:13 26:22
dates 17:6
david 5:14
day 16:8 21:9 23:10
  51:19
days 14:4 48:18,21
dealing 16:23 36:5
  38:8
dealings 8:11
dealt 13:14,16
decides 35:5
decision 33:6 35:6
declare 50:1
decline 8:4 16:8
definitely 28:6
  40:22
denote 7:20
department 44:15

deposition 5:16 6:4
  11:9 34:20 35:25
  42:12
depositions 5:17
described 40:21
  45:16,17
despite 44:23
develop 44:2
difference 7:11
  42:22
different 17:20
  38:19 42:25,25 43:1
  47:20
differentiate 23:17
difficult 16:5 42:18
direct 13:7
direction 51:13
directly 7:24 13:7
  21:19
discontinued 46:5
discovered 24:19
dispute 30:22
distinct 47:14
distinguished 12:19
  12:20,22 13:2
document 24:15,19
  40:10
documents 9:22
  35:17,18,23
domestic 32:15
domiciled 31:20
  32:3
donna 12:15 14:19
  15:1 21:19 22:14,16
  26:3,9 28:8 36:13
  39:7 40:23,25
donna's 23:14
doors 28:20
dora 42:11

**e**

e 4:12 11:4,13,14,18
  12:14 13:18,25 14:7
  14:18 18:17,22 21:3
  21:5,6,12 22:6,16

**[e – hours]**

22:18,25 23:2,12,15
23:18,21 26:17
28:11 40:18,21
41:10,18,22 42:2,13
44:10
**earlier** 15:4
**earthquake** 25:14
**easier** 16:10
**easily** 23:10
**effective** 21:25
**efforts** 10:21
**either** 10:5 28:20
29:4,14 33:11
**employed** 26:11
**employee** 34:5
**ended** 10:25
**endorsement** 19:18
19:22
**endurance** 25:8
**enduser** 31:24
**entails** 29:6
**entity** 24:23
**entry** 20:4,5 46:15
**envelope** 49:9,10
**errata** 48:7,21
**esq** 3:5,14
**estate** 37:14
**et** 17:10
**events** 9:5
**eventually** 24:12
**exact** 28:13
**examination** 1:11
2:11 4:2 5:10,20
6:19 12:4 22:22
24:20 30:11 43:23
47:4 48:3 51:6,11
**excess** 7:17,19
**exclude** 19:7
**excluding** 19:9
**excuse** 12:1
**executed** 50:4
**exhibit** 4:12 9:7
11:9,12 12:4 19:21
24:16 27:18 34:19
34:20 35:24 38:15

42:4,12
**exhibits** 4:10
**expect** 47:17
**experience** 15:21,25
16:3 29:2 30:18
32:20
**expert** 29:4,14
**expiration** 17:6
**explain** 7:11,19
**extent** 17:6
**extinguisher** 19:17
19:19
**extinguishers** 17:16
**extra** 11:8

**f**

**fac** 18:21,24
**fact** 14:17 15:15
35:2 40:2
**facultative** 18:25
**fair** 26:7 32:14
**fairfield** 1:8 2:8
6:23 8:22 9:14
15:12 35:19 36:22
42:16 44:5
**familiar** 13:12
**family** 12:21
**fee** 33:12
**figures** 37:8
**file** 25:18,19 39:3
40:9
**filed** 15:11,16
**files** 22:19
**filled** 17:12,14,15
26:15 35:24 36:16
41:13
**finally** 8:12
**finance** 3:12
**find** 26:14 39:5
**fine** 40:16
**finished** 44:1
**fire** 17:16,22 19:17
19:19 20:6 29:11
38:5

**first** 7:4 21:13 24:9
24:22 26:14 34:1,2
**five** 10:22 14:4
15:12
**flag** 43:3
**focussed** 7:3
**follow** 24:4
**following** 5:19
**follows** 5:8 22:6
**footage** 37:9
**foregoing** 50:3 51:6
51:14
**form** 17:8 19:14
20:14 24:22 26:15
28:8 35:24 36:4,8
38:4,21 39:9,24
40:2,20 41:12,18,24
41:24 44:9 45:3
**formal** 22:10
**formed** 20:16
**formerly** 12:10
**forms** 17:12 44:11
45:7
**forth** 51:8
**forward** 12:2
**forwarded** 13:25
41:10 42:8 44:14
**free** 13:24 14:14,23
**front** 18:10 34:17
**full** 5:12
**functional** 29:21
**funny** 25:16
**further** 43:23 47:4
51:15
**futter** 35:17,21
**future** 6:4

**g**

**gap** 21:14,24
**ge** 3:12 6:2 47:6
**general** 9:18 11:22
13:5 25:2,13 26:8
31:5
**generally** 18:4 22:1

**georgia** 3:8
**getting** 25:25
**give** 7:5 40:8
**given** 19:5 26:18
29:24 35:18
**giving** 21:4
**gl** 14:10
**go** 8:3 13:6 16:21
18:17 21:3 25:5,6
26:17,21 27:6 31:12
33:9 34:9,10
**going** 6:17 7:2 9:15
10:24 11:12 46:19
**gong** 28:20
**good** 16:7 25:23
48:14 49:12
**grade** 17:6
**granite** 12:25
**great** 21:6
**group** 12:23
**guarantee** 28:3
**guards** 17:9
**guercio** 13:12,19
18:19

**h**

**half** 15:4 16:7,13
**hand** 11:12 36:1
**happen** 16:17 22:18
26:10
**happened** 18:15
**happens** 33:17
**harder** 7:23 30:19
**help** 30:25
**helped** 44:2
**hi** 14:8
**higher** 16:15
**highlight** 21:12
**hire** 34:8,9
**holder** 47:6,15
**holders** 47:11
**hour** 23:9
**hourly** 17:10
**hours** 13:10

Page 4

[huh - marked]

**huh**  26:4
**hypothetical**  15:15
**hypothetically**  46:3

**i**

**idea**  48:14
**identification**  11:10
**identify**  10:24
**impossible**  16:6,9
  42:19
**inception**  45:23
**included**  26:23 41:5
**including**  20:12
  22:10 26:20
**incorrect**  15:19,20
  44:21
**increase**  42:23
**increased**  42:22
**indemnity**  2:13 3:3
  6:22 11:1 19:1 30:1
**index**  4:1
**indicate**  15:1
**indicated**  12:18 14:7
  42:16
**indicates**  36:18,25
  37:3 40:2
**industry**  7:21 15:23
  16:1 29:15 32:21
  45:3
**information**  9:23
  12:13,14 13:22
  14:16,21 18:18,20
  25:23 29:24 33:20
  37:13,23,25 38:11
  38:14,15 40:19,22
  41:2 43:18 44:13
**initial**  26:21
**inspect**  33:7,8,9,10
  33:14 34:7
**inspection**  33:12,13
**installed**  17:8
**instance**  8:17 9:25
  18:15 20:17 26:13
**insurance**  6:21 7:9
  7:10,12,15,17,21

8:8,11 9:2,3,8 10:1
10:9,23 12:3,17,23
12:25 13:3 14:19
15:22,25 16:3,18
17:12 20:16 21:20
23:24,25 24:12
25:10,11 29:8 30:13
30:15 31:18 32:1
35:5 38:8,16 39:7
39:14,18,25 42:11
43:13 44:4 45:3,13
47:10
**insure**  10:10
**insured**  6:23 8:15
  8:18 9:19 11:23
  15:2 16:1 20:23
  31:25 34:22,25 35:3
  37:22 43:2 45:12,14
  45:22 47:8,21
**insureds**  7:16
**insurer**  33:6
**interested**  40:9
  51:17
**interior**  28:19
**internal**  18:22
**interpret**  17:24 18:2
**involved**  36:8 43:9
**issued**  23:24,25
  24:13
**item**  8:25 19:11
**items**  7:3 19:11

**j**

**j**  3:5
**jeannette**  13:11,12
  18:19,19
**job**  1:24
**joseph**  42:12
**judge**  6:13
**june**  12:12 36:19

**k**

**keep**  25:18,19,21
**keys**  17:7
**kf&c**  24:24

**kind**  31:3
**know**  9:12,25 16:17
  18:6 23:2 24:23,25
  25:1,1 26:10 28:25
  29:11,19 34:9 35:20
  38:20 39:19 40:6
  41:17
**knowledge**  29:21
**known**  7:22
**kui**  4:13 11:18 13:16
  13:19 14:8 18:17,23
  19:3,5 21:4 22:4
  23:15 24:6 25:16
  26:22 33:20,24
**kyle**  3:4,5,10 4:6
  5:11,15 6:8,15,16
  6:17 11:6,11 40:13
  40:15,21,23 43:24
  47:24 48:14,20 49:4
  49:7,12

**l**

**l**  1:22 2:16 51:4,23
**labeled**  24:16
**language**  28:14
**larchmont**  6:25
**largest**  25:2
**law**  32:6,9
**laws**  50:2
**left**  18:4
**legal**  46:20 48:12
**liability**  11:22 25:14
  25:15 31:5
**licensed**  7:16
**liens**  37:19
**life**  16:10 45:24
**likewise**  34:16
**line**  28:23 29:3,10
  29:11
**lines**  7:20 31:14,24
  32:4,15,17
**list**  28:7,7
**listed**  47:7
**literally**  41:10

**litigation**  6:1
**little**  38:19
**llc**  1:8 2:8 3:4 6:23
  15:12 36:22 44:6
**llp**  3:13
**location**  17:16
**locations**  17:17
**locked**  20:3 37:3
  46:9
**long**  15:22
**look**  16:22 19:21
  22:21 24:16 25:12
  34:10 48:18
**looking**  10:9 20:15
**looks**  13:25 18:23
  26:2 36:13
**los**  1:12 2:13 5:1
  6:25 51:2
**loss**  37:25 41:12
  42:10
**losses**  19:6 38:1
**lot**  18:3 25:19,21,23
  26:1 35:20 42:24

**m**

**madam**  5:15
**mail**  4:12 11:18
  13:18,25 14:7 18:22
  21:5,6,12 22:6,16
  22:18,25 23:2,12,15
  23:18,21 28:11
  40:18,21 41:10,18
  41:22 42:2,13 44:10
**mailed**  12:14 14:18
**mailing**  6:24
**mails**  11:4,13,14
  18:17 21:3 26:17
**maintain**  36:9,11
**making**  5:23
**man**  33:23
**managing**  13:5 25:2
**manner**  21:20
**mark**  11:5
**marked**  11:9 12:3

[market - prairie]

**market** 7:20 8:7
  31:8,10 36:4
**marketing** 10:21
**markets** 28:5,6
**marks** 23:19
**material** 39:18 40:8
  44:24
**matter** 39:3 42:21
  43:6
**mean** 18:21 21:1
  27:24,24 31:16 36:7
**means** 10:13 18:24
  18:25 45:23
**meant** 48:23
**mention** 48:1
**met** 21:1
**mga** 13:4
**mgas** 25:2
**mind** 18:12
**minute** 22:2
**misrepresentation**
  44:25
**monday** 22:5 23:4
**monitor** 41:2
**monitoring** 28:10
  29:12,20 44:7,23
  46:1
**month** 46:4
**months** 38:1
**mortgage** 14:11,17
  37:16 47:6,11,15
**mortgages** 13:22
**moshe** 8:21,22 9:16
  24:21 35:18,19,25
**moshe's** 5:20 9:13
  12:4
**multiple** 25:11

**n**

**name** 5:12 6:17 8:21
  12:7,15 24:23 26:3
  34:1,1,2,3 40:22
  51:19
**named** 6:23 11:23
  33:24

**nation's** 25:2
**nature** 32:17
**necessarily** 18:2
  36:7 42:23
**need** 7:24
**needs** 48:22
**neighborhood** 37:6
**neither** 51:15
**never** 29:16
**non** 12:20 13:20
  14:8 31:18 32:7,11
  32:13
**normal** 9:5 10:13
**normally** 48:20
**north** 3:6,15 6:24
**notary** 49:2
**note** 21:14
**noted** 17:17 49:13
**notice** 11:15 18:22
  41:11,24
**notifies** 29:13
**noting** 17:15
**november** 15:24
**number** 4:11 17:5,9
  34:18

**o**

**o0o** 5:3
**oath** 1:11 2:11 5:7
  5:21 6:19 22:22
  24:20 48:3 51:6,9
**objections** 5:18 6:11
  51:11
**obligation** 37:16
**obligations** 47:11,14
  47:17,20,21
**obtain** 25:3
**occasions** 44:3
**occupancy** 36:18
**occupation** 7:8
**occupied** 12:10
  30:20
**occurred** 28:25
**offer** 19:2 25:7,13
  32:15 48:10

**offering** 33:21
**offhand** 23:3 26:24
**officially** 13:4
**offsite** 28:24
**oftentimes** 48:25
**oh** 41:23,23
**okay** 14:6 19:8
  41:23 49:10
**ongoing** 6:2 45:20
**operate** 46:5
**operational** 14:13
  29:21 37:1
**opinion** 46:20
**opportunity** 48:3
**order** 24:6
**original** 9:12 10:21
  26:25 27:4,12 38:24
  42:7
**outcome** 51:17
**outlined** 19:16
**outlining** 19:3
**owes** 47:21

**p**

**p.m.** 2:15 22:5 49:13
**package** 24:9
**page** 4:11 11:14,14
  13:18 16:21 19:21
  24:9 25:20 27:6
**pages** 1:25 25:20
**paid** 37:14
**paper** 25:8,9,9
  31:19
**paraphrase** 23:11
**parenthetically**
  26:10
**part** 12:20 20:15
  26:25 27:12 38:21
  38:24 41:8
**particular** 9:11
  26:13,15,16 40:20
**parts** 35:14
**party** 6:6 51:16
**passed** 30:1 41:2

**pasted** 23:14,20
**pay** 31:22,25
**payment** 45:13
**payments** 13:23
  14:11,17
**penalty** 50:1
**pendency** 46:10
**people** 25:19 26:1
  36:4,11 48:12
**percent** 17:17
**perils** 11:23
**period** 7:1 21:10,10
  21:11 43:4 46:10
**perjury** 50:1
**person** 38:7
**personal** 19:23
**place** 7:23,24 10:1
  10:12,14,18,20
  16:11 30:16,19 31:4
  45:2 46:1 51:8
**placed** 8:6 51:9
**placement** 8:8 26:16
  38:21 43:9
**placing** 7:17 31:1
  38:9
**please** 5:15 7:8
  11:21 14:7 17:2
  18:20 22:9 24:17
**point** 6:14
**pointed** 12:6,10
**police** 29:12,13
**policies** 12:19 16:19
**policy** 6:21,22,25
  8:12 10:18 16:17
  19:15,18 20:16
  23:24 24:12 32:1
  33:11 41:5,7 45:2
  45:14,15,24,24
  46:10 47:8,12,15,18
**pops** 18:11
**possible** 27:16
**potentially** 21:2
  46:19,21
**prairie** 7:6

Veritext National Deposition & Litigation Services
866 299-5127

[precedent - ruling]

precedent 45:12
premises 17:22 20:3
 45:16 46:9
premium 16:15
 42:21,24
premiums 32:23
prepare 48:7
president 7:9
pretty 39:10
prior 18:20
probably 10:22 19:1
 21:20,24 22:3 23:4
 23:9,17,19 29:12
problem 49:11
proceed 35:5,8
proceeding 35:9
process 10:6 39:24
 40:1 41:9
products 25:13
professional 25:14
programs 12:19,20
 12:22 13:2
promise 45:20
promissory 45:4
 46:7,12,17
proper 48:15
properly 9:23 48:8
properties 6:24
 25:24
property 3:12 11:23
 14:9 16:22 20:1
 25:14 29:17 31:5
 34:8,10 35:13 36:5
 37:20 40:3
proposed 21:19
proprietary 10:25
protected 45:16
protection 20:6
 21:10
protective 19:12,22
 20:24,25 45:4,17
 46:6,11,16
protects 28:19
provided 38:16

providing 21:22
provision 11:15
public 49:2
purchase 37:11
purchasing 12:23
pursuant 6:20
put 5:16 23:19
 34:11 45:2 49:9

q

question 15:7,10
 16:1 22:9 27:13
 38:18 42:15
questioning 11:17
questions 6:18 7:2
 13:19 18:4,9 21:18
 23:1 30:6 44:1
quotation 19:8
 23:19
quote 13:7 18:21,24
 19:2,4,8 21:21,22
 22:10 23:25 24:1,5
 25:6 33:13 43:2,4,5
 43:7
quoted 14:10
quotes 25:3 33:3
quoting 11:22 18:20
 40:1

r

raise 43:3
rarely 26:8
rate 21:6
rates 13:21
rationalizing 27:11
ratliff 12:16,17
 22:14,16 26:9,11
 28:8 36:13 38:7,12
 38:20 40:23,25
 44:10
ratliff's 26:3
read 14:6 20:2 22:13
 48:3
reading 22:6
ready 25:22

real 37:13
really 5:23
recall 23:12
receive 39:15
received 24:5,5
 38:11 41:10
recognize 26:5
recognizes 33:2
recollection 21:16
 22:25 44:3
record 5:13,24 6:10
 7:4 51:14
recorded 51:12
red 43:3
reese 3:13
reference 15:7
 19:25 27:1
referred 45:3
referring 42:4
reflect 32:23
regard 9:17 11:17
 14:20 16:3,18 17:19
 19:5 20:5,8
regarding 19:22
regular 8:3,4
regulations 43:1
reinsurance 18:25
 19:1
related 51:16
rely 9:21 44:17
relying 9:22
remain 14:13
remember 23:3
 26:24
renewal 10:6,7
renewed 13:20 14:8
renewing 12:20
report 9:23
reported 1:21
reporter 2:17 5:16
 48:6
represent 20:14
 25:11 47:6
representation
 23:22

representations
 29:25 44:18
representative 44:5
representatives 8:19
represented 44:6
require 9:18
research 33:21
reserving 5:17 6:10
responded 14:1 21:5
response 14:3 15:9
 22:4
result 13:9 23:22
retail 7:12,13,15,23
 8:14 9:22 13:6,7
 25:21
retain 25:7
review 13:11 48:11
 48:12
reviewed 17:11
right 29:9 33:14,21
 34:7,13,22,25 35:14
 36:1,16,21,23 38:2
 38:12 40:4 48:9
rings 29:7
risk 10:2,18 12:23
 13:11 16:4,14 31:9
 32:8,10,14,15 33:7
 33:12,14 34:11,14
 35:9 38:9 43:18,19
risks 7:18 8:1 30:15
 30:19
risky 32:18,24
riss 1:11 2:12 4:4,14
 5:5,14 6:17 11:5
 22:11 29:16 43:25
 47:25 51:7
roughly 16:13
rowe 3:14 4:7 5:22
 30:9,12 40:17,24
 47:5
rules 43:1
ruling 6:12

[s - tax]

| s | | | |
|---|---|---|---|
| **s**  18:21 | **september**  4:12 7:1 | **sorry**  17:21 41:19 | **string**  4:12 |
| **safeguard**  45:4,17 | 7:1 10:7 21:13,15 | 47:13 | **stuff**  5:18 |
| 46:7,11,15 | 21:17 22:1,5 23:4 | **sort**  5:18 23:11 | **subject**  32:5 33:12 |
| **safeguards**  19:12,15 | **series**  11:4,13 16:23 | 29:10 | **submission**  8:2 9:19 |
| 20:24,25 | **service**  20:13 | **sounds**  32:9 | 12:15 15:17 18:7 |
| **safety**  2:12 3:3 6:3 | **serviced**  17:8 | **speak**  22:14,15 | 26:22,23,25 27:4 |
| 6:21 11:1 16:18 | **set**  47:18 51:8 | **speaking**  28:18 | 42:6,7 |
| 18:25 19:14,23 | **she'll**  48:16 49:9 | **special**  19:8 | **submit**  11:24 31:9 |
| 21:21,21 23:23 24:7 | **sheet**  48:7,21 | **specialist**  29:3 | 39:24 |
| 25:5,5,6 26:21 | **sher**  42:11 | **spoken**  8:22 | **submitted**  9:9 13:10 |
| 27:18 28:4,6 30:1 | **shomer**  9:2 10:1,9 | **sprinkler**  13:23 | 18:18 26:20 27:17 |
| 31:12,14,18 32:1 | 12:17 14:19 21:20 | 14:13,20 | 27:19 |
| 41:9,11,15 44:14 | 22:15 27:16,23,24 | **sprinklered**  17:18 | **submitting**  11:1 |
| **saying**  18:19 19:16 | 27:25 30:15 38:8,12 | **square**  37:9 | **subscribed**  51:18 |
| **says**  14:11 20:22 | 39:7 41:13,20 42:11 | **ss**  51:1 | **subsequently**  18:10 |
| 26:9 35:12 37:22 | 43:13 44:4 | **stamped**  49:9 | 18:14 24:7 33:10 |
| 38:1 | **shop**  27:20 31:9 | **stands**  24:25 | **sufficient**  29:7 48:18 |
| **schedule**  45:17 | **shopping**  1:8 2:8 | **start**  11:17 | **suite**  3:7,16 7:6 |
| 46:16 | 6:23 8:22 12:7 | **started**  5:23,25 | **supervision**  51:13 |
| **schneerson**  42:12 | 15:12 36:22 44:5 | **starts**  46:3 | **supervisory**  20:13 |
| **schneerson's**  9:15 | **short**  28:7 | **state**  5:12 6:9 12:25 | **supplement**  39:17 |
| **section**  5:7 16:22 | **shorthand**  2:16 | 31:17,21,23 32:2,4 | **supplemented**  38:25 |
| **secure**  9:23 | **show**  9:7 11:4 | 45:11 50:2 51:1 | **supply**  43:17 |
| **secured**  20:1,3 | **sign**  49:1,1 | **statement**  5:19,24 | **sure**  11:16 17:3 20:3 |
| 46:14 | **signature**  9:15 26:5 | 6:5 | 23:6 38:25 40:12 |
| **security**  21:10 27:13 | 50:9 | **states**  21:6 | 48:14 49:4 |
| **see**  8:8 9:16 16:24 | **signatures**  9:17 | **station**  13:23 14:12 | **surplus**  7:17,19 |
| 18:10 21:7 26:8 | **signed**  9:16,19 26:8 | 14:20 17:7,18 20:12 | 31:14,24 32:4,17 |
| 27:20 28:2,13 34:18 | 34:21,25 35:3,6,8 | 21:23 22:8 27:1 | **survey**  8:7 |
| 48:4 | 36:13 | 28:10,14,24,24 29:5 | **suspect**  40:13 |
| **seen**  24:22 26:15 | **significance**  20:19 | 38:5 41:1,2 | **system**  13:24 14:13 |
| 45:7 | **significant**  44:25 | **stenographically** | 14:21 44:7,23 46:1 |
| **self**  49:9 | **signing**  9:14 | 51:12 | |
| **send**  23:8 25:12 | **similar**  25:4 | **stephen**  3:14 | t |
| 48:16,17 49:8,9,10 | **simple**  25:20 | **steve**  6:17 11:6 | **take**  16:14,14 19:21 |
| **sense**  27:21 32:6 | **simply**  29:24 49:1 | 29:16 40:13 | 24:16 46:5 48:8 |
| **sent**  10:22 18:18 | **single**  12:11 | **steve.rowe**  3:19 | 49:8 |
| 21:4 22:4,16 24:7 | **sir**  11:12 18:21 | **steven**  1:11 2:11 3:5 | **taken**  2:12 5:21 6:20 |
| 28:3,4,5 39:13 | 19:13 30:7 43:21 | 4:4,13 5:5,14 22:10 | 51:7 |
| 41:15 | 47:23 49:12 | 51:7 | **talk**  29:4 |
| **sentence**  12:18 | **sit**  23:5,7 | **steves**  40:6 | **talked**  24:15 |
| **separate**  47:11,14 | **slightly**  16:5 42:18 | **stipulation**  5:16 | **talking**  42:5 |
| | **smoke**  17:16 | **street**  7:6 | **tax**  13:22 14:11,17 |
| | **somebody**  34:10 | **strike**  9:1 | 31:24 |

[taxes - yesterday]

taxes 37:14
telemarketing 12:11
telephone 29:3,11
tell 22:24 33:12
telling 20:22
ten 10:22 25:20 28:5
28:7
tenant 12:11
term 7:20 33:11
terms 6:20 13:21
14:9 33:22
testified 5:7
testimony 30:14
36:3 42:18 51:10
thank 30:8 43:21
47:23,24 49:12
thanks 22:10
theft 19:6,7,9 21:7
21:10,22 22:10 31:6
41:5
thereof 51:17
thing 28:18 48:1
things 17:4 46:25
think 32:9 38:18
47:2 48:15
thinking 27:11
third 12:11
thought 42:5
till 22:1,2
time 10:6,17 12:21
12:24 15:1 18:5
21:14,24 23:5 26:15
27:19 30:7 33:3,17
33:18 49:13 51:7,8
51:11
times 45:15 48:25
today 6:12 22:22
told 19:17,19
top 21:13 24:23
tougher 8:1
transaction 43:12
transcribed 48:4,5
51:13
treaties 42:25

tried 10:17
trouble 40:8
true 44:18 50:3
51:14
truth 9:21
truthfully 16:12
try 10:20 16:10
tunneled 7:2
turn 8:7 11:13 29:13
29:25 32:1 44:13
turned 44:24
turns 44:21
two 27:21 44:3,10
44:23
type 7:17 17:5 22:2
32:4
typed 48:24
types 8:4
typical 35:2
typically 18:7

u

u.k. 25:9
uh 26:4
unauthorized 20:4
46:14
uncommon 39:23
45:9
underscored 22:7
23:16
understand 28:17
30:14 36:3
understanding 8:25
42:17
understood 45:11
49:3
underwrite 16:4
underwriter 33:23
underwriters 33:19
underwriting 16:19
23:9 44:15
unheard 26:1
unoccupied 10:10
use 26:1 39:9

uses 12:23
usually 25:18 33:11
utilities 36:25
utilize 6:7

v

vacancy 14:14
vacant 10:5,7,10
12:12 14:9 25:24
30:18,23 33:1,3
36:5
valuation 37:8
various 10:22 12:23
18:8,9 19:15 25:7
25:12,13,23 26:20
28:5 31:9
vein 25:4 29:13
veracity 9:21
verbatim 23:13,21
vice 7:9
violation 46:6,11
void 46:21,24
volume 1:14 2:12

w

w 24:23
waiting 21:25 22:3
waive 48:9
want 6:6,9 11:4
21:12 31:3,6
wanted 34:11
wants 34:24 39:19
warrant 19:12
warrants 19:15,18
45:14
warranty 19:23
20:19,21 45:4 46:7
46:12,17
watchmen 17:9
way 31:19 43:6
51:17
we've 5:17 34:17
40:18 48:1
wednesday 1:13
2:15 5:1

went 27:18 31:8
whereof 51:18
wholesale 7:10,12
7:14 10:14 13:3
17:24 30:13
wholesaler 7:24
wilshire 2:13
windows 28:20
witness 4:2 5:6
48:11,19 49:3,6,11
50:9 51:8,10,18
witnesses 48:2
wkf&c 25:1,6,16,17
25:17,25,25 27:20
27:24,25 28:1,1,4,6
35:24 36:8 44:9
word 31:22
work 7:5,15,16 22:2
25:17 30:14
working 11:7
world 29:8 32:6
write 7:25 31:21,23
32:2,14,18
writes 8:12
written 6:21
wrong 48:24
wrote 13:19 18:19
21:9 41:5

x

x 18:21

y

yair 5:20 8:21 12:4
24:20
ybm 6:24
yeah 12:22 24:5
43:7
year 15:3
years 15:13
yesterday 24:19

**Steven J. Kyle**

| | |
|---|---|
| **From:** | Steven Riss [Steven.Riss@amwins.com] |
| **Sent:** | Monday, September 13, 2010 12:04 PM |
| **To:** | Kui Chen |
| **Subject:** | RE: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10 |

Agent confirmed

**They do have a central station burglar alarm.**

Can I please get formal quote incl theft thanks

**Steven Riss**
Vice President
AmWINS Insurance Brokerage of California, LLC
An AmWINS Group Company
818.772.3819 (direct)
steven.riss@amwins.com
19867 Prairie Street
Suite 250
Chatsworth, CA 91311
CA LIC #0C01319
*Colemont Insurance Brokers is now AmWINS Brokerage. My contact information has changed;*
*please update your records.*

**From:** Kui Chen [mailto:kui.chen@amsafety.com]
**Sent:** Thursday, August 19, 2010 9:47 AM
**To:** Steven Riss
**Subject:** RE: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

No security protection, no theft...



**Kui Chen, CPCU │ Property Underwriter**

**21600 Oxnard Street, Suite 2050 │ Woodland Hills, CA 91367**

**D: 818.449.3101 │ C: 646.706.1743 │ F: 818.347.4411**

**Email: kui.chen@amsafety.com**

**From:** Steven Riss [mailto:Steven.Riss@amwins.com]
**Sent:** Thursday, August 19, 2010 9:46 AM
**To:** Kui Chen
**Subject:** RE: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

Rate seems great but why no theft?

**Steven Riss**
Vice President
AmWINS Insurance Brokerage of California, LLC
An AmWINS Group Company
818.772.3819 (direct)
steven.riss@amwins.com

Exhibit
1
4/18/12
Steven Riss
Cathryn L. Baker, CSR 7695

12/12/2011

19867 Prairie Street
Suite 250
Chatsworth, CA 91311
CA LIC #0C01319
*Colemont Insurance Brokers is now AmWINS Brokerage. My contact information has changed; please update your records.*

**From:** Kui Chen [mailto:kui.chen@amsafety.com]
**Sent:** Thursday, August 19, 2010 9:36 AM
**To:** Steven Riss
**Subject:** FW: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

Steve, see my number below first, call me any questions please. Thanks!



**Kui Chen, CPCU | Property Underwriter**

**21600 Oxnard Street, Suite 2050 | Woodland Hills, CA 91367**

**D: 818.449.3101 | C: 646.706.1743 | F: 818.347.4411**

**Email: kui.chen@amsafety.com**

**From:** Jeannette Guercio
**Sent:** Thursday, August 19, 2010 8:20 AM
**To:** Kui Chen
**Subject:** RE: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

Kui,

Prior to quoting please get a fac quote for x/s 3mm.

Ok to quote special excluding theft
No Rents coverage as building is vacant.
Deductible 10,000 Except 25,000 VMM
Warrant applicable protective safeguards.
.400 rate

Jeannette Guercio
Vice President
American Safety Insurance Services
Tele. 732.933.2969
Email: jguercio@amsafety.com

**From:** Kui Chen
**Sent:** Wednesday, August 18, 2010 6:28 PM
**To:** Jeannette Guercio
**Subject:** FW: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

Jeannette, here is the additional info for you, thanks!

**Kui Chen, CPCU | Property Underwriter**

12/12/2011

21600 Oxnard Street, Suite 2050 | Woodland Hills, CA 91367

D: 818.449.3101 | C: 646.706.1743 | F: 818.347.4411

Email: kui.chen@amsafety.com

---

**From:** Steven Riss [mailto:Steven.Riss@amwins.com]
**Sent:** Wednesday, August 18, 2010 3:27 PM
**To:** Kui Chen
**Subject:** RE: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

Hi Kui,
Its being non renewed because its vacant. I don't have any prop terms yet but the GL has been quoted already for around $2800. Agent says confirmed

       All mortgage and tax payments are current - YES
       Central station automatic sprinkler system will remain operational during vacancy. - YES
       If building free of all combustibles- YES


**Steven Riss**
Vice President
AmWINS Insurance Brokerage of California, LLC
An AmWINS Group Company
818.772.3819 (direct)
steven.riss@amwins.com
19867 Prairie Street
Suite 250
Chatsworth, CA 91311
CA LIC #0C01319
*Colemont Insurance Brokers is now AmWINS Brokerage. My contact information has changed; please update your records.*

---

**From:** Kui Chen [mailto:kui.chen@amsafety.com]
**Sent:** Sunday, August 15, 2010 10:02 AM
**To:** Steven Riss
**Subject:** FW: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

Steve, please respond to Jeannette per below, thanks!

**ASI**

**Kui Chen, CPCU | Property Underwriter**

21600 Oxnard Street, Suite 2050 | Woodland Hills, CA 91367

D: 818.449.3101 | C: 646.706.1743 | F: 818.347.4411

Email: kui.chen@amsafety.com

---

**From:** Jeannette Guercio
**Sent:** Sunday, August 15, 2010 6:35 AM
**To:** Kui Chen
**Subject:** FW: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

Why is the account being non renewed?
What's are your rates and terms?

12/12/2011

Please confirm:  All mortgage and tax payments are current
　　　　　　　Central station automatic sprinkler system will remain operational during vacancy.
　　　　　　　If building free of all combustible

Jeannette Guercio
Vice President
American Safety Insurance Services
Tele. 732.933.2969
Email: jguercio@amsafety.com

**From:** Kui Chen
**Sent:** Friday, August 13, 2010 6:55 PM
**To:** Jeannette Guercio
**Subject:** FW: Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

Hi Jeannette, can you review this risk please? Thanks!

**ASI**

**Kui Chen, CPCU | Property Underwriter**

**21600 Oxnard Street, Suite 2050 | Woodland Hills, CA 91367**

**D: 818.449.3101 | C: 646.706.1743 | F: 818.347.4411**

**Email: kui.chen@amsafety.com**

**From:** Steven Riss [mailto:Steven.Riss@amwins.com]
**Sent:** Friday, August 13, 2010 11:57 AM
**To:** Kui Chen
**Subject:** Fairfield Shopping Center LLC PKG/DIC - eff 9-15-10

Hi Kui,
Attached is our submission including Acord GL & Property apps and currently valued loss runs for a vacant office building in Alabama.  (Don't let the named insured fool you, this is not a shopping center!)

Formerly occupied by a single telemarketing tenant, the building has been vacant since June, 2010.

Their current policies are with Distinguished Programs (WHO IS NONRENEWING) and include $5 mil sub-limits for EQ and Flood with $25,000 deductible.

**Steven Riss**
Vice President
AmWINS Insurance Brokerage of California, LLC
An AmWINS Group Company
818.772.3819 (direct)
steven.riss@amwins.com
19867 Prairie Street
Suite 250
Chatsworth, CA 91311
CA LIC #0C01319
*Colemont Insurance Brokers is now AmWINS Brokerage. My contact information has changed; please update your records.*

mailgate.amwins.com made the following annotations

12/12/2011

------------------------------------------------------------------

This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of the person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer. Thank you. ------------------------------------------------------------------

NOTICE OF CONFIDENTIALITY AND DAMAGE DISCLAIMER: The information in this e-mail and any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message, delete any copies held on your systems and notify the sender immediately. You should not retain, copy, nor disclose all or any part of its content to any other person. This e-mail and any attachment(s) are believed to be free from virus. However it is the responsibility of the recipient to ensure that they are virus free. We do not accept any liability for any loss or damage arising in any way from the receipt, opening or use of this e-mail and any attachment(s).

NOTICE OF CONFIDENTIALITY AND DAMAGE DISCLAIMER: The information in this e-mail and any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message, delete any copies held on your systems and notify the sender immediately. You should not retain, copy, nor disclose all or any part of its content to any other person. This e-mail and any attachment(s) are believed to be free from virus. However it is the responsibility of the recipient to ensure that they are virus free. We do not accept any liability for any loss or damage arising in any way from the receipt, opening or use of this e-mail and any attachment(s).

NOTICE OF CONFIDENTIALITY AND DAMAGE DISCLAIMER: The information in this e-mail and any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message, delete any copies held on your systems and notify the sender immediately. You should not retain, copy, nor disclose all or any part of its content to any other person. This e-mail and any attachment(s) are believed to be free from virus. However it is the responsibility of the recipient to ensure that they are virus free. We do not accept any liability for any loss or damage arising in any way from the receipt, opening or use of this e-mail and any attachment(s).