FILED

2016 Jul-18  PM 02:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| AMERICAN SAFETY INDEMNITY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:12-cv-02415-SGC |
| | ) | |
| FAIRFIELD SHOPPING CENTER, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

This action involves a dispute over insurance coverage for damage to a vacant commercial building in Fairfield, Alabama.  Plaintiff American Safety Indemnity Company ("ASI") issued an insurance policy for the property at issue, and Defendant GE Commercial Finance Business Property Corporation ("GE"), the mortgagee of the property, filed an insurance claim with ASI for approximately $3.5 million in alleged losses caused by theft and vandalism at the property.

ASI asks this court to declare there is no coverage under the insurance policy for GE's claim or for a claim brought by Defendant Fairfield Shopping Center, LLC ("FSC"), the owner of the property.  (Doc. 1).  GE asserts counterclaims

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 49).

against ASI for breach of the insurance contract and bad faith based on ASI's failure to pay its claim.  (Doc. 54).  ASI moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on its claims for declaratory judgment against FSC and GE and also on GE's counterclaims.  (Doc. 67).  ASI also moved to exclude certain testimony from GE's designated experts, and GE moved to strike ASI's reply brief.  (Docs. 68 & 79).  The motions are fully briefed and ripe for review.  (*See* Docs. 67, 68, 72, 73, 74, 75, 77, 79 & 81).  This Court has jurisdiction under 28 U.S.C. §§ 636(c), 1331, and 1367.  For the reasons stated below, ASI's motion to exclude is **GRANTED IN PART** and **DENIED IN PART**, and its motion for summary judgment is will be granted in part and denied in part.  GE's motion to strike is **DENIED**.

## I.  SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment always bears the initial

2

burden of proving the absence of a genuine issue of material fact. *Id.* at 323. If the moving party does not meet its initial burden, then the Court must deny the motion for summary judgment. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)).

Once the moving party has met its burden, then the non-moving party must "go beyond the pleadings" and point to specific facts in the record to show there is a genuine issue for trial. *Celotex*, 477 U.S. at 324 (citation omitted). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (per curium) (quoting *Anderson*, 477 U.S. at 249). The court must "examine the evidence in the light most favorable to the non-moving party," drawing all inferences in favor of such party. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and

unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation omitted).   Finally, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.  FACTUAL BACKGROUND[2]

### A.  The Property, Note, and Mortgage

This action arises from a dispute over an insurance policy issued to FSC for commercial property located at 6501 EJ Oliver Boulevard in Fairfield, Alabama ("the Property").  (*See* Doc. 67-4, p. 3).  To purchase the Property, FSC borrowed $3.52 million from GE and executed a note and mortgage on September 15, 2006, which granted GE a security interest in the Property.  (*Id.*).  FSC defaulted on the note, and GE issued a notice of default to FSC in April 2009.  (*Id.*; Doc. 73-1, pp. 10, 12).  GE planned to foreclose on the mortgage, but FSC filed a Chapter 11 bankruptcy petition on May 26, 2009, to stop the pending foreclosure.  (Doc. 73-1, p. 13).

While FSC's bankruptcy was pending, it leased the Property to Bamaco, Inc., who used the Property for electronic bingo operations.  (Doc. 67-25, p. 2; Doc. 73-2, pp. 2-3).  Bamaco stopped paying rent and vacated the Property in May

---

[2] To the extent any factual inferences are drawn, they are drawn in favor of GE, the non-movant.

4

2010, when its bingo operations at the Property closed.  (*See* Doc. 73-2, pp. 3-4).

Bamaco was the last tenant of the Property, and the Property remained vacant at all

relevant times.  (*See* Doc. 67-4, p. 4; Doc. 73-2, p. 4).

After Bamaco vacated the Property, Yair Ben Moshe, a manager of FSC,

filed a declaration dated August 17, 2010, in FSC's bankruptcy proceedings in

which he stated in relevant part:

> I [] instructed a local friend in Alabama to inspect the site periodically
> so that I would be informed of the condition of the Property.  I have
> recently received photos as well as the regular report as to the
> condition of the Property.  The Property is clean and the parking lot is
> empty.  The Property is secure with no apparent vandalism.  [FSC]
> has received no reports of any vandalism at the site.  In addition, in
> the last couple of months, the insurance company which insures the
> Property conducted an inspection of the Property and found it to be in
> good condition. [. . .]  [FSC] is preparing a minimal budget to keep
> basic security services and water service in place and will present it to
> [GE], [FSC's] only secured lender, for its authority to use cash
> collateral . . . to pay these certain expenses.

(Doc. 73-2, pp. 3-4).  Ben Moshe filed a second declaration dated October 5, 2010,

in which he again stated "[t]he Property is secure with no apparent vandalism" and

further stated "[FSC] has continued to make adequate protection payments to GE

. . . , [and FSC] has sufficient funds . . . to continue to make said payments for

many months."  (*Id.*, pp. 13-14).[3]

---

[3] GE relied upon Ben Moshe's declarations regarding the condition of the Property.  (*See* Doc.
73-1, p. 88).

### B. FSC's Application for Insurance and the Policy Issued to FSC

On August 13, 2010—while FSC's bankruptcy petition was pending—FSC submitted an application for insurance to ASI through the Shomer Insurance Agency in Los Angeles, California.   (Doc. 67-5, p. 2).   In its application, FSC represented that no bankruptcies or tax or credit liens had been filed against it in the past five years, and it described the Property as having offsite power and water service.[4]   (*Id.*, pp. 2, 4).   Additionally, in email messages between ASI and an insurance broker representing FSC's interests, the broker confirmed that FSC was current on all mortgage and property tax payments with respect to the Property and that the Property had a central station sprinkler system and burglar alarm.  (Doc. 67-6, pp. 3-4, 8).   The communications between ASI and the insurance broker indicate ASI would not issue an insurance policy with theft coverage unless there was active security protection at the Property.  (*Id.*, pp. 8-9).

Based in part on the representations made in the application and the information received in the email communications, ASI issued commercial insurance policy number 201CMP1000482-10 to FSC on September 15, 2010 (the "Policy").  (Doc. 67-2, p. 3; Doc. 67-7, p. 4).  The Policy insured the Property as a vacant building with a limit of insurance of approximately $7.75 million, subject to a $25,000 deductible per occurrence, and it provided coverage for physical loss or

---

[4] GE was unaware of what FSC represented in its insurance application.  (Doc. 73-1, p. 29).

damage to the Property, including damage caused by theft or vandalism.  (Doc. 67-2, pp. 4, 13, 21 &27; Doc. 67-26, pp. 17-19, 21).   The Policy's commercial property declarations indicate the Policy provided replacement cost coverage for the building.[5]  (Doc. 67-2, p. 4).

The Policy identified GE as the mortgagee and contained a mortgage clause, providing in pertinent part:

> [ASI] will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as their interests may appear.

> [] The mortgage holder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

> [] If we deny [FSC's] claim because of [FSC's] acts or because [FSC has] failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:  (1)  Pays any premium due under this Coverage Part at [ASI's] request if [FSC has] failed to do so; (2) Submits a signed, sworn proof of loss within 60 days after receiving notice from [ASI] of [FSC's] failure to do so; and (3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.  All of the terms of this Coverage Part will then apply directly to the mortgageholder.

(*Id.*, pp. 4, 24-25).   Additionally, the Policy contained a Protective Safeguard Promissory Warranty endorsement, which provided in part as follows:

> In consideration of the premium charged, it is understood and agreed by the insured that it is a condition precedent to the acceptance of this

---

[5] The Policy defines building to include "[f]ixtures, including outdoor fixtures; [p]ermanently installed [] [m]achinery and [e]quipment; [and] [p]ersonal property owned by [FSC] that is used to maintain or service the building or structure or its premises, including . . . [a]ppliances used for refrigerating, ventilating, cooking, dishwashing or laundering . . . ." (*Id.*, pp. 4, 13).

insurance and payment of any claim under the policy that the insured warrants that at all times during the currency of the policy, (1) the premises described herein is protected by the [applicable] protective safeguard . . . and, (2) the insured shall maintain in complete working order all equipment and services pertaining to the operation of the described protective safeguard.

[Applicable Safeguards: . . .]

Premises is Locked and Secured against unauthorized entry. [. . .]

Automatic Sprinkler System including Central Station supervisory service therefore.

Burglar Alarm including Central Station supervisory service therefore. . . .

BREACH OF ANY WARRANTY(S) SHALL RENDER COVERAGE PROVIDED BY THIS POLICY NULL AND VOID

(Doc. 67-2, p. 8) (emphasis in original).  Finally, the Policy set forth certain duties in the event of a loss, including "[n]otify[ing] the police if a law may have been broken[,] [g]iv[ing ASI] prompt notice of the loss or damage[,] . . . [t]ak[ing] all reasonable steps to protect the Covered Property from further damage, . . . [and] if feasible, set[ting] the damaged property aside and in the best possible order for examination."  (*Id.*, p. 21).

## C. Cancellation of the Policy

After the Policy issued, FSC failed to respond to repeated requests to schedule an inspection of the Property; therefore, ASI cancelled the Policy and issued a Notice of Cancellation of Insurance on December 28, 2010, which was sent to both FSC and GE.  (Doc. 67-8; Doc. 67-9, pp. 2-3).  As stated in the notice,

8

the Policy was cancelled on February 2, 2011, due to FSC's lack of cooperation with the inspection.  (*Id.*, p. 2; Doc. 67-7, p. 5).  Thus, the Policy was only in effect from September 15, 2010 to February 2, 2011 (the "Policy Period").

ASI learned of FSC's pending bankruptcy after it cancelled the Policy, and it also learned the electrical and water services were turned off at the Property in June 2010.[6]  (Doc. 67-7, p. 5).  ASI would not have issued the Policy if it knew FSC was in bankruptcy at the time it submitted its application or if it knew there was no power and, thus, no active alarm system with central station monitoring or fire suppression system at the Property.  (*Id.*, pp. 5-6).

### D. November 2010 Inspection of the Property

GE prepared again to foreclose on the mortgage in late 2010, and it retained IVI Assessment Services ("IVI") to conduct an environmental assessment of the Property.  (Doc. 67-28, p. 4; Doc. 67-29, p. 6).  Richard Crooks visited the Property on November 18, 2010, to complete the assessment.  (Doc. 67-28, p. 4).  The building on the Property was locked, so Crooks could not access the interior of the building during his visit.[7]  (*Id.*, pp. 4-5).  Instead, Crooks inspected just the

---

[6] Alabama Power disconnected electric service at the Property on June 30, 2010.  (Doc. 74-11, p. 39).

[7] Crooks attempted to gain access to the interior of the building by calling a locksmith, but before he could get in, a maintenance person stopped him from trying to enter the building.  (Doc. 67-11, p. 2; Doc. 67-28, p. 5).  The maintenance person then called the police who came to the Property.  (Id.).  At least one of the police officers went up on the roof with Crooks and saw that

exterior and roof of the building, which he accessed by a ladder, and he took pictures of the exterior and roof. (*Id.*, p. 4; Doc. 32-7, p. 5).

Crooks observed that some of the HVAC[8] units on the roof had been vandalized and parts had been taken out of some of the units, and the damage he observed on November 18, 2010, appeared recent to him. (Doc. 67-28, pp. 5-6). Crooks also observed that some of the HVAC units had been moved from the curbs on which the units were mounted on the roof. (*Id.*, p. 6). As a result, Crooks saw holes down into the building where the HVAC units had been moved off their curbs. (*Id.*, pp. 6, 9). Crooks did not attempt to assess the damage to the HVAC units or note how many holes were in the roof of the building because doing so was beyond the scope of the environmental assessment. (*See id.*, pp. 6, 9). Additionally, some of the HVAC units on the roof were not damaged, and Crooks did not attempt to count how many of the units had been vandalized and how many had not. (*Id.*, p. 8).

Crooks did not report the damage to the HVAC units he observed to anyone at GE. (*Id.*, p. 6). The information Crooks gathered from his inspection went to Greg Doyle, his supervisor at IVI, though Doyle does not remember Crooks telling him about damage to the HVAC units. (*Id.*; Doc. 67-34, p. 13). On November 29,

---

some of the HVAC units on the roof were damaged and other HVAC units were not. (*See* Doc. 67-11, p. 9; Doc. 67-28, p. 5).

[8] HVAC stands for heating, ventilation, and air conditioning.

2010, Doyle sent an email to GE regarding Crooks's visit to the Property. (Doc. 67-10, p. 2). Doyle reported that Crooks could not access the interior of the building during his visit because the building was locked, but he did not report anything else to GE about the condition of the Property. (Id.).

### E. November 20, 2010 Attempted Copper Theft

On November 20, 2010, two days after Crooks's visit, Fairfield Police arrested two people at the Property for attempting to steal copper coils from three HVAC units. (Doc. 67-11, pp. 3-4). The police officer who made the arrest found the thieves attempting to load the copper coils into a vehicle parked near the back wall of the building on the Property. (*Id.*, pp. 6-9). The police impounded the copper coils and vehicle, and the thieves were later released because the police could not locate the owner of the Property. (*Id.*). The police report regarding the November 20, 2010 attempted theft does not indicate the thieves accessed the interior of the building on November 20.[9] (*See id.*).

### F. Appointment of a Receiver for the Property

In early 2011, GE petitioned to have GlassRatner, Inc. appointed as a receiver to take possession of the Property. (Doc. 67-3). Prior to the filing of the petition for a receiver, Pascal Zachary, a former employee of GlassRatner, visited the Property on January 20, 2011. (Doc. 67-31, p. 27). The building was locked

---

[9] GE did not learn about the attempted theft when it occurred. (*See* Doc. 67-27, p. 16)

on January 20, and Zachary did not find any way to get inside.  (*Id*.).  Accordingly, he only inspected the exterior and roof of the building, which he accessed by a ladder.  (*Id*., pp. 27, 32).  While on the roof, Zachary saw that every HVAC unit appeared damaged.  (*See id*., p. 28).  However, Zachary testified he is not sure if every unit he observed on the roof was actually an HVAC unit, and he does not know when they were damaged.  (*Id*., pp. 29-30).

Zachary took photographs during his visit, which he included in a report to GE regarding his observations at the Property.  (Doc. 67-13; Doc. 67-31, pp. 27-28).  In the report, Zachary noted there was trash and debris at the Property, boarded-up windows, a broken window, and vandalized HVAC units on the roof of the building.  (Doc. 67-13, pp. 3-4, 8).  The report also noted the electrical power to the building was off, so the fire safety system was not powered.  (*Id*., p. 7).  Zachary also included a description of the roof in his report, stating as follows:

> The roof itself appears to be in good shape.  This is a very high grade roof.  There are some bubbled/soft spots but probably very little leaking.  There are several 3-4 inch square patches.

(*Id*., p. 4).  Zachary sent the report of his January 20 visit to the Property to GE on January 21, and Zachary's report was the first notice GE received regarding theft or vandalism at the Property.  (Doc. 67-27, p. 16; Doc. 67-31, p. 30; Doc. 73-1, p. 24).

On February 9, 2011, one week after the end of the Policy Period, GE filed a petition for the appointment of a receiver in the Circuit Court of Jefferson County. (Doc. 67-3).  GE requested GlassRatner be appointed as receiver on an expedited basis to allow the receiver to immediately begin securing the Property.  (Doc. 67-3).  In its petition, GE noted:

> (1) the [] Property appears vacant and abandoned in an area where numerous abandoned buildings are located; (2) the exterior gates were and are unlocked and open; (2) [sic] numerous windows are broken; (3) evidence of missing, vandalized and stolen HVAC and other equipment was visible; (4) there is a large accumulation of trash and other debris on the [] Property; and (5) the electricity and fire safety system is shut off.

(*Id.*, p. 5).  The Circuit Court of Jefferson County entered an order appointing GlassRatner as receiver of the Property on February 11, 2011.[10]  (Doc. 67-14).

### G. The Receiver's February 2011 Inspection of the Property

On February 14, 2011, twelve days after the Policy Period ended, Zachary visited the Property again and went inside the building for the first time.  (*See* Doc. 67-15, p. 4; Doc. 67-31, pp. 34, 37).  During his February 14 visit, the exterior doors to the building were secure, though Zachary saw evidence the exterior doors had been pried open previously.  (Doc. 67-31, p. 35).  Inside the building, Zachary saw evidence of water damage, though he does not recall seeing any active leaks on February 14.  (*Id.*, pp. 37-38, 85).  Zachary also saw damage to the circuit

---

[10] The receivership continued until December 2013.  (Doc. 67-35, p. 42).

breakers and electrical wiring inside the building, and he assumed electrical equipment was stolen from the building sometime before February 14.[11]   (*Id.*, pp. 36-37, 40-41).   Zachary did not inventory the condition of the Property or the contents of the building during his February 14 visit.   (*Id.*, pp. 23, 41). Additionally, Zachary does not know how many different incidents of vandalism or theft occurred at the Property, or when they occurred.  (*Id.*, p. 58).

After he visited the Property, Zachary prepared a short report regarding what had to be done to secure the Property, and he sent his report to GE on February 15, 2011.  (Doc. 67-15).  In the report, Zachary noted the following:

> (A) No electrical power is on.  The meter is set but all of the breakers have been vandalized.   (B) Water is off and should remain off. (C) The exterior HVAC Systems are gone.   The interior systems located in the ceiling appear to be intact.  (D) There appear to be roof leaks.  Those will be repaired as needed.

(*Id.*, pp. 4-5).  Zachary also contacted the Fairfield Police on February 15 to report the theft of the HVAC components, though he did not report the theft of any electrical equipment.[12]   (*Id.*, p. 1; Doc. 67-31, pp. 40-41; *See also* Doc. 67-11, p. 9).

After receiving Zachary's report, Pam Eggett, a GE employee managing the Property, sent Zachary a copy of the certificates of insurance for the Property so he

---

[11] Zachary admitted he cannot say when electrical equipment was stolen from the Property, or if electrical equipment was stolen after February 2, 2011.  (Doc. 67-31, p. 41).

[12] The theft of electrical equipment from the building was never reported to the police.

14

could prepare an insurance claim with respect to the stolen HVAC equipment. (Doc. 67-31, p. 44).   Seth Brown, an employee of GlassRatner, then called the Shomer Insurance Agency, FSC's insurance agent, in late February or early March 2011 to get a copy of the Policy and "find out what needed to be done to file a claim." (Doc. 67-35, p. 50).

### H. March 2011 Inspections of the Property

Zachary visited the Property again on March 4, 2011, about one month after the Policy Period ended, with Chris Miller, an employee of IVI, the company GE hired to conduct the environmental assessment.[13, 14]  (Doc. 67-31, p. 50).  After the visit, Zachary sent an email to Eggett informing her the padlock and chains used to secure the ladder and prevent access to the roof of the building had been cut and the "building entered from the roof, [but] [t]here was no[] vandalism to the interior." (Doc. 67-16, p. 2; *See also* Doc. 67-31, p. 51).

Miller inspected both the interior and exterior of the building, including the roof, on March 4.  (Doc. 67-29, pp. 11, 14).  Inside the building, Miller saw signs of water damage and an open hole in the roof, but he did not see any active water leaks.  (*Id.*, pp. 11-13, 37).  Additionally, he saw evidence that electrical wires had

---

[13] GE sent IVI back to the Property to finish the environmental assessment because IVI had not been able to go inside the building during its November 18, 2010 visit.  (*See* Doc. 67-29, p. 6).

[14] The record indicates Zachary visited the Property at other times between February 14 and March 4, 2011, but there is no information regarding what he may have observed on those visits.

been ripped out and stolen from the building.[15]   (*Id*., p. 14).   On the roof of the building, Miller saw HVAC units had been opened and metal stolen from inside the units, and he saw pieces of metal lying on the roof.   (*Id.*, p. 14-15).   Miller did not look at each HVAC unit or document which units were damaged because doing so was beyond the scope of the environmental assessment, but he testified "just about every unit there" was damaged.   (*Id*., p. 15).   After his visit, Miller informed Greg Doyle, his supervisor at IVI about the damage he saw to the building and HVAC units.   (*Id.*, p. 16).   Miller also prepared a report of his visit, which Doyle sent to GE on March 14, 2011.   (Doc. 67-34, p. 18; *See also* Doc. 73-3).

Zachary returned to the Property again on March 9, 2011, and saw active water leaks inside the building, and he then went on the roof to determine the source of the leaks.   (Doc. 67-31, pp. 52-54).   Zachary reported the leaks to GE that day, stating as follows:

> Last night the area was subject to torrential down pours.  I toured the interior.  The rain has stopped but the cascade of water continues in the interior.  My initial assessment of the interior found it dry with evidence of previous leaks (carpet squares curled at edges).  Now this area is flooded.  So I went to the roof.  Two issues here.  First the destroyed rooftop HVAC units would allow water to leak inside. Second I discovered 3 gouges in the roofing material that I believe occurred during the theft of the HVAC copper.  I will try to include that in the insurance claim.

---

[15] Miller does not know what electrical equipment was in the building prior to his visit or what, if anything, Bamaco may have done to alter the electrical wiring when they vacated the building. (Doc. 67-29, pp. 20, 26).

(Doc. 67-17, p. 2).  Zachary does not know when the gouges he observed in the roof were made.  (Doc. 67-31, pp. 55, 73).

## I.  __Removal of the HVAC Units__

Based on Zachary's observations at the Property on March 9, the damaged HVAC units were covered with tarps in an effort to stop the water leaks into the building.  (*Id.*, p. 57).  However, storms in the area "rendered [the] tarp solution useless," so Zachary determined a more permanent solution was required.  (*See id.*, p. 60).  Accordingly, in April or May 2011, Zachary hired Commercial Renovators to remove the damaged HVAC units from the roof and to cover the curbs where the units had been mounted on the roof.  (*See* Doc. 67-18, p. 2; Doc. 67-31, pp. 60-61).  Commercial Renovators removed every HVAC unit from the roof of the building, and none of the units were retained for inspection.  (Doc. 67-18, p. 2; Doc. 67-30, p. 32; Doc. 67-33, pp. 9, 38).  There is no indication in the Rule 56 record that Commercial Renovators, or any other entity, inventoried the HVAC units that were removed from the roof.  (*See* Doc. 67-33, p. 38).

Zachary sent Eggert a report regarding the repairs on May 13, 2011, informing her "[t]he destroyed HVAC units have been removed, and all the debris carted off," and the repairs would be completed by May 18.  (Doc. 67-19, p. 2).  In his report, Zachary also described the condition of the roof as follows:

> Now that so much trash has been removed the remaining issues with the roof can be seen.  The initial assessment from Jan 20 of this year

17

was the roof was in fair shape.  In fact the roof is in very poor shape in
some areas.  The roof is a rubberized roofing system.  On the surface
is a waterproof membrane covering foam insulation.  Evident now are
the tears, nicks and weakened surface.

(*Id*.).   Zachary's report also indicated the tears in the roof would be patched and
the ladder to the roof would be removed to try to prevent unauthorized access to
the roof, which he described as "[o]ne of the unresolved security issues."  (*Id.*, pp.
3, 6).  Although the roof was repaired, the record indicates it continued to leak
until at least July 7, 2011, and Zachary concluded the leaks would not stop
"without a very expensive new roof."  (Doc. 67-31, p. 73).

### J.  Preparing and Filing the Insurance Claim

In April 2011, GlassRatner hired Darrell Varnado to evaluate the damages at
the Property, estimate the cost of repair, and file an insurance claim.  (Doc. 67-30,
p. 6; Doc. 67-31, p. 46).  Varnado visited the Property in mid-April—more than
two months after the end of the Policy Period.  (Doc. 67-30, pp. 8-9).  During his
visit, he accessed the roof, but did not enter the building.   (*Id*.).  He also did not
walk across the roof because he saw "pieces of metal scattered about it, and
walking across it could have caused damage." (*Id.*, p. 9).  Varnado did not see any
holes or tears in the roof during his visit, but he assumed there must be punctures
in the roof because of the debris and metal panels he saw.  (*Id.*, pp. 10, 56).

After his first visit to the Property, Varnado enlisted Roddy Jerkins to help
him prepare the insurance claim.  (Doc. 67-30, pp. 7, 11; Doc. 67-31, pp. 46-47,

57).   Jerkins and Varnado visited the Property together in early May 2011, approximately three months after the Policy Period ended, and inspected the interior of the building, but not the roof.  (Doc. 67-30, p. 12).   During that visit, Varnado observed the carpet was wet, the flooring in a computer room was damaged, and electrical panels were damaged, and he also saw a ladder in the electrical service room that went up to a hole near the ceiling.  (Doc. 67-30, pp. 12-13).   Varnado does not know when the damage to the electrical equipment occurred.  (*Id*., pp. 13-14).

Following the May 2011 visit to the Property, Varnado contacted Shomer Insurance Agency on June 8, 2011, and reported a claim over the phone.  (Doc. 67-21, p. 2; Doc. 67-30, p. 59).   The agency then prepared an Acord Property Loss Notice dated June 8, 2011, which was sent to ASI.  (*See* Doc. 67-26, p. 43; Doc. 67-21, p. 2).   The Loss Notice erroneously identifies the date of loss as February 17, 2011, and stated, the "Property was severely vandalized and suffered water damage; vandals took copper pipes, wiring, AC, anything of value."[16]   (Doc. 67-21, p. 2).

Jerkins returned to inspect the Property on June 27, 2011—almost five months after the Policy Period ended.  (Doc. 67-32, p. 10).   During his inspection,

---

[16]   ASI received the June 8, 2011 Loss Notice and hired Engle Martin on June 10 as an independent adjuster to evaluate the claim and damage to the Property.  (Doc. 67-26, pp. 15, 43).

he saw holes in the roof with light shining through and active leaks in the building. (*Id.*).  Jerkins did not go on the roof because all the HVAC units had already been removed and the temporary repairs on the roof had been completed before June 27, so there would have been "nothing for [him] to see on the roof."[17]  (*See id.*, p. 12).

Almost five months after Jerkins's inspection, he and Varnado prepared and submitted to ASI a Sworn Statement in Proof of Loss, claiming a net loss of $3,464,724.88.[18]  (Doc. 67-23, p. 2; Doc. 67-33, p. 53).  The Proof of Loss was signed by Pascal Zachary as the insured and dated November 18, 2011.[19]  (Doc. 67-23, p. 2).  Additionally, it identifies the date of loss as November 20, 2010 and the cause of loss as theft of property.  (*Id.*).

In response to the Proof of Loss, ASI sent a letter dated December 20, 2011, to counsel for GE and Zachary.  (Doc. 67-12).  The letter stated ASI "will reject this Proof of Loss on the basis the proof of loss was not supplied by nor agreed to by ASI[]."  (*Id.*, p. 2).  However, the letter goes on to state "[ASI] acknowledges the receipt of the Sworn Statement in Proof of Loss on behalf of the insured, [FSC], . . . [but] ASI does not consider nor acknowledge this document as a Sworn

---

[17] Jerkins never went on the roof at the Property.  (Doc. 67-32, p. 12).

[18]  The net loss was calculated by deducting $25,000, the amount of the deductible per occurrence, from $3,489,724.88, the claimed actual cash value of the loss.  (Doc. 67-23, p. 2). The Proof of Loss also claimed the actual cash value of the building was $7,753,000, an amount equal to the full amount of the Policy.  (*Id.*).

[19] Although Zachary signed the Proof of Loss, he does not have any independent knowledge of whether the statements in it were accurate.  (Doc. 67-31, p. 78).

Statement in Proof of Loss by the mortgage holder, GE . . . ." (Id., p. 3). Finally, the letter also states "[b]y acknowledging receipt of the Proof of Loss submitted by the insured/receiver, ASI[] does not accept nor deny the claim of the insured/receiver as there are a number of critical facts that need to be clarified through further investigation." (Id.).

On May 2, 2012, counsel for ASI sent a blank Sworn Statement in Proof of Loss form to counsel for GE, and GE returned the completed and signed form to ASI on May 18, 2012. (Doc. 73-14; Doc. 73-15). The completed Sworn Statement in Proof of Loss was executed May 15, 2012, and again claimed a net loss of $3,464,724.88, which was calculated by deducting the $25,000 deductible per occurrence from the claimed actual loss. (Doc. 73-15, p. 3). It also identified the date of loss as November 20, 2010, and referred to the police report regarding the theft of the HVAC coils. (Id.). The May 15, 2012 proof of loss form also referred to an estimate by Commercial Renovators dated August 12, 2011, which provides a detailed description of the loss. (Id.). The estimate includes a quote for $1,427,204 to replace damaged electrical components in the building and a quote for $426,000 to repair the HVAC system. (Id., p. 67).

After receiving the May 15, 2012 Proof of Loss, ASI filed this action seeking a declaration there is no coverage under the Policy for either FSC or GE for the losses at the Property. (Doc. 1). For its part, GE seeks coverage under the

Policy as the mortgagee of the Property, and it filed counterclaims against ASI for breach of contract and bad faith based on ASI's failure to pay its claim.  (Doc. 54, pp. 10-14).  ASI now seeks summary judgment on its declaratory judgment claims and on GE's counterclaims.

## III.  ANALYSIS

Currently pending before the court are ASI's motion to exclude testimony from GE's experts, ASI's motion for summary judgment, and GE's motion to strike ASI's reply brief.  (Docs. 67, 68 & 79).  The court will address ASI's motions separately after first dispensing with GE's motion to strike.

### A. GE'S Motion to Strike

GE argues ASI's reply brief in support of its motion for summary judgment must be struck from the record because it was filed too late.  (Doc. 79, pp. 1-2). This argument is without merit.  The court's Initial Order required ASI's reply brief to be filed within fourteen days of GE's response brief, which was filed on September 23, 2015.  (Docs. 13 & 72).  Although fourteen days after September 23 is October 7, and ASI did not file its reply brief until October 13, the reply was timely under Rule 6.  (*See* Doc. 77).

Rule 6(d) provides:

[w]hen a party may or must act within a specified time after service and service is made under Rule 5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a).

22

Fed. R. Civ. P. 6(d).  GE's response brief was filed electronically, which means it was served under Rule 5(b)(2)(E) and three days are added to the fourteen-day period set out in the initial order.  *See Vestavia Plaza, LLC v. City of Vestavia Hills, Ala.*, 2013 WL 4804196, n.1 (N.D. Ala. Sept. 9, 2013).  As a result, ASI's deadline to file its reply brief was extended to October 10, 2015, which was a Saturday, so the time period for filing the reply "continue[d] to run until the next day that is not a Saturday, Sunday, or legal holiday."  Fed. R. Civ. P. 6(a)(1)(C).  Since Monday, October 12, 2015 was a legal holiday, the time period for ASI to file its reply brief ran until Tuesday, October 13, and ASI's brief was timely filed.

GE next argues ASI's reply brief must be struck from the record because it raises an argument not raised in ASI's initial brief.  Specifically, GE asserts the court should refuse to consider ASI's arguments regarding the applicability of California law to the interpretation of the Policy because ASI did not argue for the application of California law in its initial brief.  (Doc. 79, p. 3).  Although ASI cited to both California and Alabama law in one section of its initial brief, it did not directly address which state's law applies to the interpretation of the Policy.  (*See* Doc. 67-1).  In spite of ASI's omission, the court will consider its arguments regarding the application of California law because, based on long-settled law and as discussed below, the court is obligated to apply Alabama's choice of law rules in this diversity action.  Therefore, the parties cannot waive application of

Alabama's choice of law rules by failing to address conflict of laws in their briefs. As a result, GE's motion to strike is **DENIED**.

## B. ASI'S Motion to Exclude[20]

ASI asks this court to exclude opinions offered by GE's experts, Darrell Varnado and Roddy Jerkins, who prepared an estimate of the losses at the Property. As discussed below, ASI's motion to exclude will be denied as to its request to exclude allegedly undisclosed opinions, and the balance of its motion to exclude will be granted.

### 1. ASI has not shown the allegedly undisclosed opinion regarding the roof system deteriorating beyond repair must be excluded under Federal Rule of Civil Procedure 37(c)(1)

ASI asserts certain opinions must be excluded because they were not disclosed in Varnado and Jerkins's expert report as required by Rule 26(a). (Doc. 68, pp. 3-5). Under the Federal Rules of Civil Procedure, "[i]f a party fails to provide information . . . as required by Rule 26(a) [], the party is not allowed to use that information [] to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

ASI contends Varnado and Jerkins testified in their depositions that "the roof system [at the Property] deteriorated beyond repair over the course of the two

---

[20] Neither party requested a *Daubert* hearing, and GE specifically indicated it does not request oral argument on ASI's motion to exclude. (*See* Doc. 74, p. 1). Because the court is not required to hold a *Daubert* hearing before ruling on the motion, *Cook v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005), and the issues presented by ASI's motion to exclude are straightforward, the court will rule on the motion without holding a *Daubert* hearing.

months following November 20, 2010" and that opinion was not disclosed in their written report.[21]   (Doc. 68, p. 4).   However, Opinion No. 7 from Varnado and Jerkins's expert report states as follows:

> We know the trapped water was [in the roof system] during the January 2011 site visit by Pac Zachary of Glass Ratner because he states in his report the following:  'There are some bubbled/soft spots but probably very little leaking.'  The trapped water cannot be sucked out nor does it disappear.  Therefore, the roof system will fail.  . . . There is no remedy of repair for the trapped water except a roof replacement.

(Doc. 74-1, p. 6).   This opinion in the written report suggests the roof had deteriorated beyond repair by January 20, 2011, the date of Zachary's visit to the Property and two months after the attempted theft on November 20, 2010.  In other words, it is very similar to the allegedly undisclosed opinion ASI seeks to exclude. (*See* Doc. 67-30, p. 58; Doc. 68, p. 4).   As a result, even if the opinion the roof deteriorated beyond repair over the course of two months following November 20, 2010 was not disclosed as required by Rule 26(a), ASI cannot show it was harmed by the alleged failure to disclose the information.   Thus, the alleged failure to disclose the opinion was harmless, and the opinion is not due to be excluded under Rule 37(c)(1).

---

[21] ASI also contends Varnado and Jerkins testified regarding two other opinions not disclosed in their expert report.  (Doc. 68, p. 4).  Those two opinions relate to unauthorized people accessing and causing damage to the interior of the Property.  (*Id.*).  Because those opinions are due to be excluded for other reasons, as discussed below, the court does not address ASI's argument they should be excluded because they were not disclosed in the written expert report.

## 2. **Certain opinions do not meet the standards of Rule 702 and must be excluded**

ASI also argues certain opinions from Varnado and Jerkins do not meet the requirements of Federal Rule of Evidence 702, which governs the admissibility of expert testimony and provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  "As the Supreme Court made abundantly clear in *Daubert*, Rule 702 compels the district courts to perform the critical gatekeeping function concerning the admissibility of expert scientific [and technical] evidence. [. . .] This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 n.7 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); and *McCorvey v. Baxter Healthcare Corp*, 298 F.3d 1253, 1257 (11th Cir. 2002)) (internal quotations and alterations omitted).  *See also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005) ("*Daubert* requires the

trial court to act as a gatekeeper to ensure that speculative and unreliable opinions do not reach the jury.") (citation omitted).

As a gatekeeper for expert testimony, the court "must conduct 'a rigorous three-part inquiry,' considering whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Cook v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005) (quoting *Frazier*, 387 F.3d at 1260 (11th Cir. 2004)).  Additionally, "[t]he court must consider the [expert's] testimony with the understanding that 'the burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion. . . .'" *Metabolife Int'l, Inc.*, 401 F.3d at 1238 (quoting *Frazier*, 387 F.3d at 1260); *see also Cook*, 402 F.3d at 1107 ("The proponent of the expert testimony carries a substantial burden under Rule 702.").  However, "[a] district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Maiz v. Virani,* 253 F.3d 641, 666 (11th Cir.2001) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999)). "Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

ASI argues certain opinions offered by Varnado and Jerkins must be excluded because they are not based on sufficient facts and are speculative and, therefore, they do not meet the requirements of Rule 702.  ASI asks the court for an order prohibiting Varnado and Jerkins from opining:  (1) any unauthorized access to the interior of the Property occurred during the Policy Period; (2) any theft or vandalism occurred inside the Property during the Policy Period; (3) the roof membrane at the Property was damaged when thieves or vandals drug sharp metal pieces across it during the Policy Period; and (4) the HVAC units subject to the attempted theft on November 29, 2010 had any value, or any other HVAC units were stolen or vandalized during the Policy Period.  (Doc. 68, pp. 26-27; Doc. 75, pp. 9-10).  Additionally, ASI argues Varnado and Jerkins cannot opine regarding the nature, condition, or value of the electrical equipment stolen from the interior of the building on the Property.[22]  (Doc. 68, pp. 19-22).  As discussed below, the

---

[22] GE contends ASI only challenges Varnado and Jerkins's opinions about the timing of the interior damage at the Property and does not challenge their opinions regarding the value of the loss attributable to theft and vandalism in the interior of the building.  (*See* Doc. 74, p. 5 n.3). However, in its motion to exclude ASI plainly states, "Jerkins and Varnado cannot reliably opine as to what was taken, whether it was functioning, when it was taken, or how much it cost." (Doc. 68, p. 19) (emphasis in original omitted).  ASI also argues "[n]either Jerkins nor Varnado can reliably establish whether operational electrical equipment was stolen from the Property during the Policy [P]eriod, nor can they establish the nature, condition, or value of such property."  (*Id.*, p. 21).  Thus, ASI clearly challenges Varnado and Jerkins's opinion regarding

court grants ASI's motion to exclude these opinions on the grounds they do not meet the requirements of Rule 702.[23]

    i.    <u>Varnado and Jerkins cannot opine thieves or vandals accessed the interior of the building on the Property and damaged the interior of the building during the Policy Period</u>

GE contends ASI's motion is moot as to its challenge to Varnado and Jerkins's opinions regarding whether thieves or vandals accessed and caused damage to the interior of the building during the Policy Period because Varnado and Jerkins will not offer such opinions at trial. (Doc. 74, pp. 2-5). However, the court agrees with ASI that it is more appropriate to rule on ASI's motion as to those opinions rather than finding the motion moot.[24]

As GE admits, the question whether thieves entered the building during the Policy Period is not a topic that requires expert testimony, "as [it is] well within the jury's ability and prerogative to decide." (Doc. 74, p. 4). Likewise, the question

---

both the timing of the interior damages at the Property and the value of the loss attributable to the theft and vandalism in the interior of the building.

[23] The court's conclusion regarding the admissibility of these expert opinions does not prohibit Varnado and Jerkins from testifying as lay witnesses as to the damage to the Property they observed during inspections and the procedures they used to reach their loss estimates. *See Preis v. Lexington Ins. Co.*, 279 Fed. Appx. 940, 943 (11th Cir. 2008) (finding the district court did not abuse its discretion by allowing insurance adjusters to testify as lay witnesses).

[24] Varnado and Jerkins's estimate of the loss includes amounts for damages related to the theft of electrical components inside the building and damage to the computer flooring in the building (*see* Doc. 74-15, pp. 63, 70), and in their expert report dated June 12, 2015, Varnado and Jerkins conclude, among other things, "there is no dispute regarding . . . the electrical theft/damage[] damage to elevated computer flooring related to the theft." (Doc. 74-1, p. 2). This conclusion suggests Varnado and Jerkins opine thieves or vandals accessed the interior of the Property and caused damage inside the building during the Policy Period even if GE did not retain them to offer such an opinion.

whether any theft or vandalism occurred in the interior of the building during the Policy Period is within the understanding of an average lay person and, therefore, within the jury's ability and prerogative to decide.  Because expert testimony will not help jurors decide if unauthorized people entered the building and caused damage to the interior of the building during the Policy Period, such testimony is not admissible under Rule 702.  *See Edwards v. Shanley*, 580 Fed. Appx. 816, 823 (11th Cir. 2014) ("For [expert] testimony to satisfy the third requirement—assisting the trier of fact—the testimony must 'concern matters that are beyond the understanding of the average lay person.'") (quoting *Frazier*, 387 F.3d at 1262); *Cook v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1111 (11th Cir. 2005) (quoting *Frazier*, 387 F.3d at 1262-63).  Thus, Varnado and Jerkins cannot opine that unauthorized people or thieves accessed the interior of the building or that any theft or vandalism occurred in the interior of the building during the Policy Period.

> ii.    <u>Varnado and Jerkins cannot offer opinions regarding the value of the electrical components stolen or vandalized in the interior of the building</u>

Varnado and Jerkins prepared an estimate of the loss, which includes amounts related to stolen or vandalized electrical components inside the building, and they refer to their estimate in their expert report.  (*See* Doc. 74-1, p. 3; Doc. 74-15, p. 70).  They relied upon a quote from Elkins Electrical Services & Construction, LLC to determine the amount of the loss attributable to the theft of

the electrical components in the building. (Doc. 67-30, pp. 23-24; Doc. 67-33, p. 64; Doc. 74-15, p. 70). Neither Varnado nor Jerkins has any independent knowledge regarding the electrical components at the Property, and neither has any special training or expertise regarding electrical systems. (Doc. 67-30, pp. 24, 36; Doc. 67-33, pp. 39, 64). Accordingly, both Varnado and Jerkins would defer to Elkins for information regarding the estimate for electrical losses. (Doc. 67-30, pp. 24, 99; Doc. 67-33, p. 64).

Federal Rule of Evidence 703 allows Varnado and Jerkins to base their opinions upon information and data provided by others if the information is the type of information reasonably relied upon by experts in their field. *See* FED. R. EVID. 703. However, Varnado and Jerkins cannot simply pass off the opinions of an expert in a different field as their own. *See Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."); *Abrams v. Ciba Specialty Chem. Corp*., 2010 WL 779283, *4 (S.D. Ala. March 2, 1010) (excluding an expert's opinion when the expert merely "served as a conduit" for another undisclosed expert) (citations omitted).

Jerkins testified that electrical estimates are "not something that we typically take the autonomy of estimating ourselves" because that work is specialized.

31

(Doc. 67-33, p. 39). Based upon that statement, GE may be able to demonstrate Elkins's quote for the electrical damage to the property is the type of information experts in the field of insurance adjusting would reasonably rely upon. However, even if Varnado and Jerkins properly relied on Elkins's quote for the electrical damage at the Property, GE still must show their opinion regarding the loss attributable to the building's electrical components is supported by sufficient facts or data. ASI argues "Varnado and Jerkins cannot reliably opine as to what was taken [from inside the building], whether it was functioning, when it was taken, or how much it cost." (Doc. 68, p. 19). As ASI noted in its motion to exclude, neither Varnado nor Jerkins knows what electrical components were inside the building and the condition of those components at the beginning of the Policy Period, or at any other time during the Policy Period, and neither knows when the electrical components were stolen. (Doc. 67-30, pp. 14, 32; Doc. 67-33, p. 65; *See also* Doc. 68, pp. 14, 21).

GE did not respond directly to ASI's arguments regarding the lack of facts to support Varnado and Jerkins's opinion regarding the value of the electrical components stolen or vandalized inside the building on the Property; rather, GE simply asserts Elkins Electrical was disclosed in their expert report and in GE's document production. (*See* Doc. 74, p. 5 n.3). GE's brief in response to ASI's motion for summary judgment also points to no specific facts to support Varnado

and Jerkins's opinion regarding the value of the electrical equipment stolen or vandalized.  (*See* Doc. 72).  Although Ben Moshe's declarations state the Property was clean and secure with no signs of apparent vandalism at the beginning of the Policy Period, they provide no information regarding what electrical components were inside the building or the condition of those components during the Policy Period.  (*See* Doc. 73-2, pp. 3-4, 13-14).  Thus, GE has not met its substantial burden of establishing Varnado and Jerkins's opinion regarding the value of the loss attributable to the theft or vandalism of the building's electrical components was based on sufficient evidence or data.  *See Cook*, 402 F.3d at 1107 ("The proponent of the expert testimony carries a substantial burden under Rule 702.").  As a result, their opinion regarding the value of the loss attributable to the theft or vandalism of the building's electrical components is inadmissible under Rule 702.

> ### iii. Varnado and Jerkins cannot opine the building's roof membrane was damaged when thieves drug sharp metal pieces across it during the Policy Period

Expert testimony must assist the trier of fact; accordingly, expert testimony is only admissible "if it concerns matters that are beyond the understanding of the average lay person. [. . .]  Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  *Frazier*, 387 F.3d at 1262 (internal citation omitted).  In this matter, Varnado and Jerkins's opinion that thieves or vandals damaged the

Property's roof membrane by dragging sharp metal components across it will not help the jury because a lay person could conclude the building's rubber roof membrane may be damaged in that manner.  Indeed, Pac Zachary, the receiver for the Property and a fact witness in this case, stated in an email to GE that he "discovered [three] gouges in the roofing material that [he] believe[s] occurred during the theft of the HVAC copper." (Doc. 67-17, p. 2).  Because a lay person can understand the building's rubber roof membrane could be damaged if sharp metal is drug across it and GE's attorneys could argue the roof was damaged in that way, Varnado and Jerkins's opinion will not help the trier of fact.  Thus, Varnado and Jerkins's opinion the roof membrane was damaged when thieves or vandals drug sharp metal pieces across it is inadmissible under Rule 702.

iv.   Varnado and Jerkins cannot offer an opinion regarding the value of the HVAC units damaged

As with their estimate for the loss attributable to damage to the Property's electrical system, Varnado and Jerkins relied upon information from a contractor to estimate the loss attributable to damage to the Property's HVAC units.  (*See* Doc. 74-15, p. 70).  ASI contends Varnado and Jerkins's opinion regarding the loss attributable to the damaged HVAC units at the Property is inadmissible because it has no factual basis and Varnado and Jerkins are not qualified to offer the opinion. (Doc. 68, pp. 16-17, 25-26).  In response, GE asserts they properly relied upon information from an HVAC contractor to arrive at their estimate of damages in this

34

case because it is the type of information reasonably relied upon by experts in the field of insurance adjusting.  (*See* Doc. 74, pp. 7-8).  However, even if Varnado and Jerkins could reasonably rely on a quote from an HVAC contractor to arrive at their opinion, doing so does not shield their opinion from the requirements of Rule 702.  Their opinion regarding the amount of the loss caused by theft or vandalism to the Property's HVAC units must be based on sufficient facts or data to be admissible.  *See* FED. R. EVID. 702.

ASI argues there is no factual basis for Varnado and Jerkins's opinion regarding the value of the damaged HVAC equipment because there is no evidence in the record of the type, model, or cost of any of the HVAC units at the Property. (*See* Doc. 68, pp. 16-17).  Although GE quibbles with ASI's assertion Varnado and Jerkins lost the quote from the HVAC contractor, it does not acknowledge, much less address, ASI's argument there is no factual basis to support Varnado and Jerkins's opinion regarding the HVAC loss.  (*See* Doc. 68, pp. 16-17; Doc. 74, p. 7-9).  Indeed, the record establishes the damaged HVAC units were removed prior to the HVAC contractor's visit to the Property.  (Doc. 67-33, p. 38).  Moreover, the damaged HVAC units were not inventoried or retained for inspection when they were removed from the Property.  (Id., pp. 38-39).  Thus, GE did not and cannot establish Varnado and Jerkins's opinion regarding the amount of the loss

attributable to the damaged HVAC units is based on sufficient facts or data to satisfy Rule 702, and the opinion is inadmissible.

> v.  Varnado and Jerkins cannot opine that any HVAC units were subject to theft or vandalism during the Policy Period

ASI also asks the court for an order prohibiting Varnado and Jerkins from opining that any HVAC units were subject to theft or vandalism during the Policy Period. (Doc. 68, p. 27; Doc. 75, p. 10). Just like the question of whether thieves entered the building during the Policy Period, the question of whether thieves or vandals damaged HVAC units at the Property during the Policy Period is well within the understanding of an average lay person, and, therefore, within the jury's ability to decide. Thus, any opinion that HVAC units were subject to theft or vandalism during the Policy Period will not assist the trier of fact and is inadmissible under Rule 702. *See Edwards*, 580 Fed. Appx. at 823.

ASI's motion to exclude the allegedly undisclosed opinion the roof deteriorated beyond repair over the course of two months following November 20, 2010 is **DENIED**. The balance of ASI's motion to exclude is **GRANTED**.

## C.   ASI'S Motion for Summary Judgment

ASI seeks summary judgment on its claims for declaratory judgment and also on GE's counterclaims against it. (Doc. 67). ASI specifically asks the court to find: (1) FSC's procurement misrepresentations void coverage under the Policy for both FSC and GE; (2) GE's claim is not covered by the Policy because the

36

Policy's protective safeguard promissory warranty was breached; (3) GE's claim is not covered by the Policy because GE failed to comply with the requirements of the Policy's mortgage clause; (4) GE's claim is not covered by the Policy because notice was untimely as a matter of law; and (5) GE's counterclaims fail as a matter of law.  (*See* Doc. 67-1, pp. 21-32).  Alternatively, ASI asks the court to declare GE's claim is limited to damages incurred on November 20, 2010, and GE cannot recover for any damages to the Property's interior or roof.  (*See id.*, pp. 32-38). For the reasons discussed below, ASI's motion will be granted with respect to its claims against FSC and the bad faith counterclaim, and the balance of the motion will be denied.

### 1.   <u>Choice of law and interpretation of the Policy</u>

This court exercises diversity-of-citizenship jurisdiction over this matter; therefore, the court must apply Alabama's conflict of laws rules to determine which state's laws govern the claims in this actions and interpretation of the Policy.  *See, e.g., Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court [in a diversity action] <u>must conform</u> to those prevailing in [the forum state's] courts.") (emphasis added); *New Hampshire Ins. Co. v. Hill*, 516 Fed. Appx. 803, 805 (11th Cir. 2013) ("Because the district court sat in Alabama, <u>it was obliged to</u> follow Alabama's *lex loci contractus* doctrine. . . .") (citing *O'Neal v. Kennamer*, 958 F.2d 1044, 1046

(11th Cir. 1992) (emphasis added)); *Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995) ("Since this is a diversity action, <u>we are required to</u> apply the substantive law of the forum state, . . . including its conflict-of-laws rules.") (citations omitted) (emphasis added).   Based on the mandatory language used by the Supreme Court and the Eleventh Circuit regarding a district court's obligation to follow the forum state's conflict of laws rules in diversity actions, the parties cannot waive application of Alabama's conflict of laws rules by failing to address the issue.[25]

Alabama adheres to the traditional conflict of laws doctrine of *lex loci contractus*, which means Alabama courts generally interpret contracts, including insurance policies, according to the law of the state in which the contract was made.  *New Hampshire Ins. Co.*, 516 Fed. Appx. at 805; *Smith v. State Farm Mut. Automobile Ins. Co.*, 952 So.2d 342, 347 (Ala. 2006) (citations omitted).   Thus, Alabama courts generally interpret insurance policies according to the law of the state in which the policy was issued.  *See New Hampshire Ins. Co.*, 516 Fed. Appx. at 805 (relying upon Alabama conflict of laws rules and applying Florida law to interpret an insurance policy issued in Florida).   However, the Supreme Court of Alabama recognizes exceptions to the doctrine of *lex loci contractus* when "the

---

[25] ASI did not directly address which state's laws govern interpretation of the Policy in its initial brief, but instead cited to both California and Alabama law in one section of the brief; GE did not address the issue at all in its opposition brief, but instead relied solely on Alabama law.  (*See* Doc. 67-1; Doc. 72).

parties intend the law of some other place to govern [the contract], or [when the contract] is to be wholly performed in some other place." *Ex parte Owen*, 437 So. 2d 476, 481 (Ala. 1983).

Here, the Policy was issued to FSC in California, so the Policy should be interpreted according to California law, unless the parties intended the law of another state to govern the Policy or the Policy was to be wholly performed in another state. (*See* Doc. 67-2, p. 3). As noted above, the parties did not address which state's law should apply to the interpretation of the Policy, but relied primarily upon Alabama law in their briefing. The court need not determine whether Alabama or California law should apply to the interpretation of the Policy if there is no actual conflict between the law of the two states. *Lemuel v. Admiral Ins. Co.*, 414 F.Supp. 2d 1037, 1049-50 (M.D. Ala. 2006) ("The first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions. . . . If there is no conflict between the competing bodies of law, . . . the court need not decide which state's law governs.") (citation omitted).

With these conflict of law principles in mind, the court turns to the substantive issues raised by ASI's motion for summary judgment. The court first addresses ASI's arguments as to coverage under the Policy for a claim by FSC before considering its arguments regarding coverage for GE's claim. The court

will then address ASI's arguments regarding GE's counterclaims and finish by considering ASI's alternative request for declaratory relief.

### 2.  <u>Coverage under the Policy for a claim by FSC</u>

ASI first contends there is no coverage under the Policy for a claim by FSC because FSC's procurement misrepresentations void the Policy *ab initio*.[26]   (Doc. 67-1, pp. 21-24).   Under California law, "[a] misrepresentation or concealment of a material fact in connection with an application for insurance is grounds for rescission of the policy."  *Superior Dispatch, Inc. v. Insurance Corp. of New York*, 181 Cal. App. 4th 175, 191 (Cal. App. 2010) (citations omitted).   "[A] misrepresentation or concealment is material if a truthful statement would have affected the insurer's underwriting decision."  *Id.* (citations omitted).   Likewise, under Alabama law, a misrepresentation in an application for insurance "that was material to the acceptance of the risk assumed by the insurer or that would have caused the insurer in good faith not to issue the policy provides a basis for the insurer to avoid the policy."  *Nationwide Mut. Fire Ins. Co. v. Pabon*, 903 So. 2d 759, 766 (Ala. 2004) (citing *Taylor v. Golden Rule Ins. Co.*, 544 So. 2d 932 (Ala. 1989); Ala Code § 27-14-7).   Additionally, "'some misrepresentations, whether made intentionally or innocently, increase the risk of loss as a matter of law and are therefore material to the issuance of the policy.'"  *Scottsdale Indem. Co. v.*

---

[26] "'*Ab initio*' means the contract is considered null from the beginning and treated as if it does not exist for any purpose."  COUCH ON INSURANCE 3D § 65:50, n.1.

*Martinez Inc.*, 615 Fed. Appx. 549, 554 (11th Cir. 2015) (quoting *Pabon*, 903 So. 2d at 767).

The record establishes FSC made several misrepresentations in its application for insurance ASI considers material.  FSC represented it had not filed bankruptcy and was not in default on its mortgage on the property even though it filed a Chapter 11 bankruptcy petition on May 26, 2009.  (Doc. 73-1, p. 13).  Additionally, FSC represented the Property had power and an active alarm and fire system when it did not.  (*See* Doc. 67-6, pp. 3-4, 8).

Representatives of ASI testified the company would not have issued the Policy if FSC provided truthful information in its application, and the Rule 56 record indicates ASI would not have issued the Policy with theft protection if it knew there was no active security protection at the Property.  (Doc. 67-6, pp. 8-9; Doc. 67-7, pp. 5-6).  Moreover, the Supreme Court of Alabama found an insured's misrepresentation regarding whether the insured or a family member recently had filed bankruptcy was material as a matter of law.  *Pabon*, 903 So. 2d at 767-68.  Thus, FSC's procurement misrepresentation regarding its bankruptcy petition was material as a matter of law.  *Id.*; *Superior Dispatch*, 181 Cal. App. at 191.

Because FSC made material misrepresentations in its application for insurance, the Policy is void as to FSC.  As a result, there is no coverage under the Policy as a matter of law for any claim brought by or on behalf of FSC.  ASI's

41

motion for summary judgment is due to be granted with respect to FSC, and ASI is entitled to a declaration there is no coverage under the Policy for any claim brought by or on behalf of FSC. Because FSC's procurement misrepresentations void the Policy as to FSC, the court need not and does not address ASI's other arguments regarding coverage under the Policy for FSC.

### 3.   Coverage under the policy for GE's claim

The Policy contains a mortgage clause providing in pertinent part as follows: "[ASI] will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations . . . . If [ASI] den[ies] [FSC's] claim because of [FSC's] acts or because [FSC] ha[s] failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment . . . ." (Doc. 67-2, p. 24). As a result, even though the Policy is void as to FSC, it is not necessarily void as to GE, the mortgageholder. Instead, to prevail on its summary judgment motion as GE, ASI must show GE's claim is not covered by the Policy as a matter of law in spite of the Policy's mortgage clause.

#### i.   FSC's procurement misrepresentations

ASI did not dispute the Policy's mortgage clause is a standard clause, which means it operates as an independent contract between the mortgagee and the insurer. *See Int'l Surplus Lines Ins. Co. v. Assoc. Comm. Corp.*, 514 So. 2d 1326, (Ala. 1987) ("Under a standard mortgage clause 'an independent or separate

contract or undertaking exists between the mortgagee and the insurer, which contract is measured by the terms of the mortgage clause itself.") (citations omitted); *Home Savings of America, F.S.B. v. Continental Ins. Co.*, 87 Cal. App. 4th 835, (Cal. App. 2001) ("[I]f the policy contains a standard loss payable clause, the mortgagee has an independent contract with the insurer which cannot be defeated by improper or negligent acts of the mortgagor."). (*See also* Doc. 72, pp. 14-16; Doc. 77, pp. 3-7).    Instead, ASI argues FSC's procurement misrepresentations render the Policy void *ab initio*, such that there is no contract with FSC and no separate contract with GE.  (Doc. 67-1, p. 24).

ASI's argument is similar to the argument raised by the insurer in *Norwest Mortgage Inc. v. Nationwide Mutual Fire Insurance Company*, 718 So. 2d 15 (Ala. 1998), an Alabama case GE relies heavily upon in its opposition.  In *Norwest*, Nationwide Mutual Fire Insurance Company issued a homeowner's insurance policy, which included a mortgage clause providing that "[i]f [Nationwide] denies [the homeowner's] claim, that denial will not apply to a valid claim of the mortgagee . . . ."  *Id.* at 16.  While investigating a loss after the home was damaged by fire, Nationwide discovered the homeowner made several material misrepresentations in her application for insurance and denied coverage to both the homeowner and Norwest Mortgage, Inc., the mortgagee, based on Alabama Code § 27-14-7, which provides in pertinent part as follows:

> All statements and descriptions in any application for an insurance policy . . . shall be deemed to be representations and not warranties. Misrepresentations . . . shall not prevent a recovery under the policy [] unless either (1) Fraudulent; (2) Material either to the risk or to the hazard assumed by the insurer; or (3) The insurer in good faith would either not have issued the policy [], or would not have issued a policy [] at the premium rate as applied for . . . if the true facts had been made known to the insurer . . . .

*Id.* (quoting Ala. Code § 27-14-7). Nationwide also filed a declaratory judgment action, "seeking a determination that the entire policy was void *ab initio* as a result of the [insured's] misrepresentations in the application." *Id.* The trial court agreed the policy was void *ab initio* and granted summary judgment in favor of Nationwide, and Norwest appealed. *Id.*

The issue presented on appeal in *Norwest* was if the insurance policy's mortgage clause was a standard clause creating a separate contract between the insurer, Nationwide, and the mortgagee, Norwest, or if it was simply a loss payable clause. *Id.* at 17. Nationwide argued the mortgage clause was a loss payable clause and not a standard clause because "the mortgage clause does not specifically state that the 'mortgagee's interests shall not be invalidated by any act or neglect of the mortgagor . . . .'" *Id.* The Supreme Court of Alabama rejected that argument and, based on the language in the mortgage clause, found it created a separate contract between Norwest and Nationwide "that was not subject to the nullifying effects of § 27-14-7." *Id.* In other words, the Supreme Court of Alabama found the insured's procurement misrepresentations did not necessarily void the contract

44

between the insurer and mortgagee even though the misrepresentations did void the policy as to the insured.[27]  Thus, under Alabama law, because the mortgage clause creates a separate contract between ASI and GE, FSC's procurement misrepresentations do not necessarily void the Policy as to GE's claim.

Although ASI relied upon Alabama law, including Alabama Code § 27-14-7, in its initial brief, it argues in its reply brief that *Norwest* does not apply in this case because the Supreme Court of Alabama's decision in *Norwest* relied in part upon § 27-14-7, which does not apply to an insurance policy issued in California. (*See* Doc. 67-1, pp. 21-24; Doc. 77, pp. 3-4); *see also* Ala. Code § 27-14-2(2) ("This chapter applies as to all insurance contracts [] other than:  . . . Policies or contracts not issued for delivery in this state nor delivered in this state . . . .").  In its reply brief, ASI contends California law must apply to determine the effect of FSC's misrepresentations on GE's claim because the Policy was issued in California.  (Doc. 77, pp. 3-4).  ASI further contends GE's reliance on *Norwest* reveals a conflict between Alabama and California law because, unlike Alabama, California law "would find the insured's procurement misrepresentations void the

---

[27] The holding in *Norwest* is consistent with the law in other jurisdictions.  *Great Am. Ins. Co. of N.Y. v. Southwestern Finance Co.*, 297 P. 2d 403, 404-05 (Okla. 1956) (holding a mortgagee's claim under an insurance policy "cannot be defeated by any act or neglect of the owner or mortgagor of the property insured, and said policy is valid as to the mortgagee, even though void *ab initio* as to the mortgagor").  *See also Reed v. Firemen's Ins. Co. of Newark*, 80 A. 462, 464 (N.J. 1911); *VT, Inc. v. GEICO Ins. Co.*, 2004 WL 1373132, *6 (N.D. Tex. June 16, 2004) (finding a lessor may recover under an insurance policy even if the policy was void *ab initio* as to the lessee).

policy as to GE and/or GE cannot rely on terms within a void policy." (Doc. 81, p. 6).

ASI did not cite any California case law addressing the particular issue raised in GE's opposition:  whether the insured's procurement misrepresentations render an insurance policy void as to a mortgagee when the policy contains a standard mortgage clause.  Indeed, none of the California cases cited by ASI in its initial brief or reply brief include any discussion of how a mortgagee's rights under a mortgage clause may be affected by an insured's misrepresentations in an insurance application.  (*See* Doc. 67-1; Doc. 77).  As a result, ASI has not shown that California law necessarily conflicts with Alabama law regarding whether an insured's procurement misrepresentations void a mortgagee's rights under a mortgage clause.  Additionally, ASI has not established that California law mandates a finding of no coverage for GE's claim under the Policy.

ASI also argues the holding in *Norwest* cannot apply to this matter because of differences between the mortgage clause in the Policy and the mortgage clause at issue in *Norwest*.  (Doc. 77, p. 5).  This argument is not persuasive.  The Supreme Court of Alabama's holding in *Norwest* was based on the Court's conclusion the mortgage clause at issue created a separate contract with the insurer and mortgagee.  *See* 718 So. 2d at 17.  Here, just as with the mortgage clause at issue in *Norwest*, the language in the Policy makes clear the mortgage clause

46

creates a separate contract between ASI and the mortgagee.  (*See* Doc. 67-2, pp. 24-25).  Indeed, ASI did not even try to dispute that the mortgage clause created a separate contract with GE.

Finally, ASI blithely asserts "'acts' [as used in the mortgage clause] cannot mean misrepresentations during procurement," but makes no attempt to explain why that is so or how the cases and California code sections cited lead to that conclusion.  (*See* Doc. 77, pp. 5-6).  Acts is not a defined term in the Policy, so it is construed "according to the meaning a person of ordinary intelligence would reasonably give it."  *HR Acquisition Corp. v. Twin City Fire Ins. Co.*, 547 F.3d 1309, 1314 (11th Cir. 2008) (quoting *Lambert v. Coregis Ins. Co., Inc.*, 950 So. 2d 1156, 1161-62 (Ala. 2006)); *see also TIG Ins. Co. of Michigan v. Homestore, Inc.*, 137 Cal. Capp. 4th 749, 754 (Cal. App. 2006).  A jury could reasonably conclude providing false or misleading information on an insurance application is an act for purposes of the mortgage clause.  Thus, the term "acts" is ambiguous as it relates to the insured's provision of information in an insurance application, and this ambiguity must be construed in favor of coverage.  *St. Paul Fire & Marine Ins. Co.*, 572 F.3d at 898 (11th Cir. 2009) ("[I]t is well established 'that when doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured.'") (quoting *St. Paul Mercury Insurance Co. v. Chilton–Shelby Mental Health Center,* 595 So.2d

1375, 1377 (Ala.1992)); *Home Savings of America, F.S.B. v. Continental Ins. Co.*, 87 Cal. App. 4th 835, 841 (Cal. App. 2001) ("If an ambiguity may be reasonably resolved by either of two constructions, we must select that which is most favorable to the named insured or mortgagee.") (citation omitted).

When the Policy, including its mortgage clause, is construed in favor of coverage and the record is viewed in the light most favorable to the GE, ASI did not establish there is no coverage under the Policy for GE's claim as a matter of law based on FSC's procurement misrepresentations.

ii.  Breach of the protective safeguard promissory warranty

The Policy contains a protective safeguard promissory warranty, by which the insured guaranteed the premises would be locked and secured against unauthorized entry and would have a working sprinkler system and burglar alarm during the Policy Period.  (Doc. 67-2, p. 8).  Breach of the warranty "shall render coverage provided by [the] [P]olicy null and void."  (*Id.*) (emphasis omitted).  ASI argues the protective safeguard promissory warranty applies to GE because the mortgage clause states "[a]ll of the terms of this Coverage Part [] apply directly to the mortgageholder," and it further argues there is no coverage under the Policy for GE's claim due to the breach of the protective safeguard promissory warranty. (Doc. 67-1, pp. 25-26; Doc. 67-2, p. 25).

Even if the protective safeguard promissory warranty applies to GE, ASI has not cited any provision of the Policy or any authority showing FSC's breach of the warranty could void coverage for GE's claim. Both Alabama and California law make clear that a mortgagor's actions do not negate a mortgagee's right to recover under an insurance policy containing a standard mortgage clause. *Int'l Surplus Lines Ins. Co.*, 514 So. 2d at 1328 ("[W]here, as here, the loss was at least arguably within the coverage afforded by the insurance and the breach of the policy provision came about as a result of the wrongful act of the insured . . . , the mortgagee's interest under a standard mortgage clause will not be defeated."); CALIFORNIA INS. LAW HANDBOOK, § 65:43 ("The standard mortgagee clause [] creates a separate contract with the mortgagee, so that the mortgagee's interest cannot be affected by any act of the mortgagor.") (citation omitted). Additionally, the treatise ASI relies upon to support its argument states "acts of the mortgagee [not the mortgagor] that are in contravention of the conditions and limitations [of the policy] will generally bar the mortgagee's recovery." COUCH ON INSURANCE 3d § 65:46 (citation omitted) (emphasis added). Thus, to be entitled to summary judgment ASI must establish an act or omission by GE, rather than an act or omission by FSC, breached the Policy's protective safeguard promissory warranty.

In its initial brief, ASI does not point to any specific action by GE that breached the protective safeguard warranty. (*See* Doc. 67-1, pp. 25-26). Instead,

ASI generally argues the warranty was breached because "the Property was repeatedly left unsecure from unauthorized entry [and] was lacking power and, thus, a central fire or burglar alarm on the date of loss." (*Id.*, p. 25). However, the evidence ASI relies on to support its argument does not show GE was responsible for the breach of the warranty. (*See* Doc. 67-1, p. 25 n.100).

First, the November 29, 2010 email sent from Greg Doyle to a GE employee shows an inspector was not able to gain interior access to the building on the Property because it was locked, and it does not indicate the Property was left unsecured. (*See* Doc. 67-10, p. 2). Second, the February 17, 2011 police report provides no evidence regarding if GE was aware of potential unauthorized entry to the Property, much less that GE could be held responsible for leaving the Property unsecured from unauthorized entry. (*See* Doc. 67-11). Next, although the January 20, 2011 GlassRatner report shows the Property had no power, an open metal fence, and a broken window, the record shows GE took steps to secure the Property once it learned of those issues. (*See* Doc. 67-3; Doc. 67-13, pp. 7-8). Indeed, after GE received the January 20, 2011 report, it filed a complaint for the appointment of a receiver to take possession of the Property in an attempt to secure the Property and prevent additional damage. (*See* Doc. 67-3, pp. 4-6; Doc. 67-4, p. 4-5).

Viewing the evidence in the light most favorable to GE, as required at this stage in the litigation, there is a question of fact regarding whether any action or omission by GE breached the protective safeguard promissory warranty. Thus, ASI has not established that GE breached the warranty as a matter of law. As a result, ASI did not carry its burden of showing there is no coverage under the Policy for GE's claim as a matter of law based on the breach of the Policy's protective safeguard promissory warranty.

### iii. Failure to meet the requirements of the mortgage clause

The Policy's mortgage clause includes certain requirements a mortgagee must comply with to recover under the Policy. (Doc. 67-2, pp. 24-25). In pertinent part, the mortgageholder has "the right to receive loss payment if the mortgageholder: . . .

> (2) Submits a signed, sworn proof of loss within 60 days after receiving notice from [ASI] of [FSC's] failure to do so; and

> (3) Has notified [ASI] of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

(Id). ASI argues GE has no right to recover under the Policy because it did not meet these two requirements imposed by the mortgage clause. (Doc. 67-1, p. 27).

First, ASI asserts it received a first proof of loss dated November 18, 2011, and it informed GE on December 20, 2011 "that it would 'reject this Proof of Loss . . . .'" (Doc. 67-1, p. 28). According to ASI, GE then had 60 days to submit a

signed, sworn proof of loss but did not submit a second proof of loss until May 15, 2012.  (Id.).  What ASI fails to acknowledge, however, is the December 20 letter did not clearly notify GE of FSC's failure to submit a signed, sworn proof of loss.

The December 20 letter was sent by ASI to GE's attorney and Pac Zachary in reply to a sworn statement in proof of loss dated November 18, 2011.  (Doc. 67-12, p. 2).  As GE points out, the letter states ASI "will reject this Proof of Loss on the basis the proof of loss was not supplied by nor agreed to by ASI[]."  (Id.).  But, the letter goes on to state:

> [ASI] acknowledges the receipt of the Sworn Statement in Proof of Loss on behalf of the insured, [FSC], through the actions of Pac Zachary, of Glass Ratner Advisory and Capital Group, the appointed Receiver of the property.  ASI[] does not consider nor acknowledge this document as a Sworn Statement in Proof of Loss by the mortgage holder, GE [].  By acknowledging receipt of the Proof of Loss submitted by the insured/receiver, ASI[] does not accept nor deny the claim of the insured/receiver as there are a number of critical facts that need to be clarified through further investigation.

(Id., p. 3) (emphasis added).  Thus, the letter acknowledges receipt of the proof of loss submitted on behalf of FSC, and viewing the letter in the light most favorable to GE, it did not provide notice to GE of FSC's failure to submit a proof of loss statement.  As a result, the December 20 letter did not trigger the mortgage clause's requirement for GE to submit a signed, sworn proof of loss statement within 60 days.

Next, ASI argues GE failed to comply with the mortgage clause's requirement to notify ASI "of any change in ownership, occupancy or substantial change in risk known to the mortgageholder." (Doc. 67-1, pp. 28-29). Specifically, ASI asserts GE failed to notify it of a substantial change in risk by failing to notify it of the following: (1) FSC had defaulted on the Note and was in bankruptcy; (2) GE filed suit against ASI and a receiver was appointed who took control of the Property; and (3) the Property was not secure and had no power or alarm system. (Id.). None of ASI complaints are sufficient to establish GE failed to comply with the requirement of the mortgage clause as a matter of law.

As an initial matter, the phrase "substantial change in risk" is not defined in the Policy, so it is interpreted according to the meaning a person of ordinary intelligence would reasonably give it. A jury could reasonably understand the phrase to mean a substantial change to the actual risk at the time the Policy was issued, and not a change compared to what ASI believed the risk to be when the Policy was issued. Here, the record establishes FSC defaulted on the Note and filed a petition for bankruptcy before the Policy was issued. (Doc. 73-1, p. 13). Thus, when the Policy is construed in favor of coverage, the record does not establish GE breached the requirement of the mortgage clause by failing to inform ASI of FSC's default or bankruptcy.

Next, GE did not file its complaint for the appointment of a receiver until February 9, 2011, and a receiver was not appointed until February 11.  (Doc. 67-3, p. 2; Doc. 67-14).   Both of those events occurred after the Policy ended on February 2, so they were not a change in the risk insured.

Finally, when the evidence is viewed in the light most favorable to GE, as it must be at this stage in the litigation, GE did not learn the Property was not secure and had no power until January 20, 2011, less than two weeks before the Policy ended on February 2.  (*See* Doc. 67-27, p. 16).   At that time, ASI had already informed GE of its intent to cancel the Policy on February 2.  (Doc. 67-9).   The Policy does not contain a deadline for the mortgagee to inform ASI once it learns of a substantial change in risk, much less indicate the mortgagee must provide notice within two weeks.  (*See* Doc. 67-2).   Because ASI had already decided to cancel the Policy by the time GE learned of the condition of the Property and because there was no deadline for GE to inform ASI of a change in risk, a jury could reasonably conclude GE did not breach the requirements of the mortgage clause by failing to inform ASI the Property was unsecure and had no power or alarm system.   Thus, ASI has not established there is no coverage for GE's claim under the Policy as a matter of law because GE did not meet the requirements of the Policy's mortgage clause.

54

iv.  <u>Untimely notice</u>

In the event of a loss, GE had several duties under the Policy, including: "[g]ive [ASI] prompt notice of the loss or damage;" "[a]s soon as possible, give [ASI] a description of how, when and where the loss or damage occurred;" and "[s]end [ASI] a signed, sworn proof of loss containing the information [ASI] request[s] to investigate the claim." (Doc. 67-2, pp. 21-22). ASI argues there is no coverage for GE's claim because notice of the claim was untimely as a matter of law. (Doc. 67-1, p. 29).

Under California law, "[a]n insured's failure to comply with the notice or claims provisions in an insurance policy will not excuse the insurer's obligations under the policy unless the insurer proves it was substantially prejudiced by the late notice." *Safeco Ins. Co. of American v. Parks*, 170 Cal. App. 4th. 992, 1003-04 (Cal. App. 2009). On the other hand, under Alabama law, "when a primary insurance policy requires notice 'as soon as practicable,' 'promptly,' or 'immediately,' the insured is obligated to give notice 'within a reasonable time considering all relevant facts and circumstances of the case,' and an insured's failure to do so releases the insurer from coverage." *Lemuel v. Admiral Ins. Co.*, 414 F.Supp.2d 1037, 1050 (M.D. Ala. 2006) (citing *Southern Guar. Ins. Co. v. Thomas*, 334 So.2d 879, 882-83 (Ala. 1976) & *Pharr v. Cont'l Cas. Co.*, 429 So. 2d 1018, 1019 (Ala. 1983)). Neither party addresses this conflict between

55

California and Alabama law, but instead both ASI and GE rely upon Alabama law to support their arguments regarding notice.

Regardless of which state's laws apply, ASI has not met its burden to show notice was untimely as a matter of law because its argument ignores several material facts in the record and misconstrues others.  ASI relies upon the Acord Property Loss Notice and the first sworn proof of loss statement to argue it was first notified of the loss over six months after the date of loss.  (Doc. 67-2, pp. 29-30).  However, ASI does not cite any provision of the Policy or any authority equating notice with receipt of a written Acord Property Loss Notice or proof of loss form, and ASI admitted notice to an insurance agent can be an accepted means of providing notice of a loss.  (Doc. 67-1; Doc. 67-26, p. 42).  Here, GlassRatner called Shomer Insurance Agency, the agent identified in the Policy, regarding the loss in late February or early March 2011, a fact ASI does not address, or even acknowledge.  (Doc. 67-25, p. 50).  Thus, viewing the evidence in the light most favorable to GE, GE provided notice of the loss approximately three months after the loss, rather than six.

Additionally, ASI does not point to any evidence that GE had notice of the theft and damage to the Property in November 2010.  (*See* Doc. 67-1, pp. 29-30).  For its part, GE's representative testified GE did not receive any notice of damage to the Property until January 21, 2011.  (Doc. 67-27, p. 16).  Thus, viewing the

evidence in the light most favorable to GE, GE notified the Shomer Insurance Agency of the loss several weeks after GE first learned of it.  As a result, ASI has not shown notice was untimely as a matter of law, and it is not entitled to summary judgment based on untimely notice of the loss.

As the party moving for summary judgment, ASI bears the burden of establishing it is entitled to judgment as a matter of law.  ASI did not meet its burden as to its claims against GE, and it has not shown it is entitled, as a matter of law, to a declaration there is no coverage under the Policy for GE's claim.  Thus, its motion for summary judgment is due to be denied as to GE.

### 4.  GE's counterclaims

GE asserts counterclaims against ASI for breach of contract and bad faith based on its allegations ASI wrongfully failed to pay covered losses under the Policy.  (Doc. 54, pp. 10-14).  ASI moved for summary judgment on both of GE's counterclaims.  (Doc. 67-1, p. 30).  For the reasons discussed above, ASI has not carried its burden to show there is no coverage under the Policy for GE's claim as a matter of law.  Therefore, ASI is not entitled to summary judgment on GE's counterclaim for breach of contract, and its motion is denied as to that counterclaim.  GE's counterclaim for bad faith presents different issues for the court to consider.

GE's counterclaim for bad faith is a tort claim. *See Hillery v. Allstate Indem. Co.*, 705 F.Supp. 2d 1343, 1365 (S.D. Ala. 2010). For tort claims, Alabama courts follow the doctrine of *lex loci delicti* and apply the law of the state in which the injury or loss occurred. *Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1309 (11th Cir. 2004) (quoting *Fitts v. Minnesota Mining & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991)).

The Property insured under the Policy is located in Alabama, and the damage to the Property occurred in Alabama. Accordingly, the loss was arguably incurred in Alabama, and Alabama law could apply to GE's counterclaim for bad faith. Additionally, ASI relied upon Alabama law in their briefs regarding GE's bad faith counterclaim.[28]  (Doc. 67-1, pp. 30-31). Therefore, the court will apply Alabama law to evaluate ASI's motion for summary judgment on the counterclaim.

To establish its claim for bad faith, GE must do more than show ASI failed to pay insurance benefits; instead, it must show the failure to pay was done in bad faith, meaning there was no reasonable ground for ASI to deny coverage under the Policy. *Adams v. Auto-Owners Ins. Co.*, 655 So.2d 969, 971 (Ala. 1995) ("[The insured] must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. If any one

---

[28] GE, on the other hand, relied upon no legal authority at all in its argument in opposition to ASI's motion for summary judgment on its bad faith counterclaim. (*See* Doc. 72, p. 30).

of the insurer's reasons for denying benefits is at least arguable, this Court need look no further; a claim for bad faith will not lie.") (citations omitted).  "Under Alabama law, the [party asserting the bad faith claim] has the burden of proving the absence of any 'reasonably legitimate or arguable reason' for the insurer to deny paying the insured's claim."  *Kruger Commodities, Inc. v. United States Fidelity and Guaranty*, 923 F. Supp. 1474, 1481 (M.D. Ala. 1996) (quoting *Fuller v. State Farm Fire and Casualty Co.*, 721 F. Supp. 1219, 1226 (M.D. Ala. 1989) (quoting in turn *McLaughlin v. Alabama Farm Bureau Mut. Cas. Ins. Co.*, 437 So.2d 86, 90 (Ala. 1983)).

ASI asserts it has various legitimate reasons to deny coverage for GE's claim based on the issues and disputes raised in its motion, including that the Policy was void *ab initio* by FSC's procurement misrepresentations, GE did not meet the requirements of the mortgage clause, and the Policy's promissory protective warranty was breached.  (*See* 67-1, pp. 21-30, 32).  Thus, ASI has shown it had at least an arguable reason to deny coverage for GE's claim.

To defeat ASI's motion for summary judgment on its counterclaim for bad faith, GE must show a genuine issue of material fact regarding if ASI had an arguable reason to deny coverage for its claim.  GE has not done so.  Rather, GE simply argues ASI is not entitled to a judgment in its favor on GE's bad faith claim because ASI breached the policy by not paying its claim.  (Doc. 72, p. 30).  This is

not enough to show a bad faith denial of the claim or to show a genuine issue of material fact regarding the issue.  As a result, ASI is entitled to summary judgment on GE's counterclaim for bad faith.

### 5. **ASI's alternative request for partial summary judgment or declaratory relief**

Along with moving for summary judgment, ASI asks the court to declare GE's claim is limited to damages incurred on November 20, 2010, and grant it partial summary judgment as to GE's claim for damages to the roof and interior of the Property.  (Doc. 67-1, pp. 32-38).  For the reasons discussed below, ASI's request for alternative relief is denied.

#### i. The claim is not limited to damages that occurred on November 20, 2010

ASI argues the claim must be limited to damages that were incurred on November 20, 2010 because that is the date of loss identified in the signed, sworn proof of loss statement.  (Doc. 67-1, pp. 32-33).  The court is not persuaded.

The Policy requires the insured to send ASI a signed, sworn proof of loss in the event of a loss or damage.  (Doc. 67-2, p. 22).  A proof of loss is a legitimate condition precedent to an insurer's duty to pay a loss.  *See Lee v. Prudential Ins. Co.*, 812 F.2d 1344, 1346 (11th Cir. 1987) (citing *Equitable Life Assurance Soc. v. Dorriety*, 157 So. 59 (Ala. 1934)).  However, it does not necessarily follow that each individual date of loss must be specifically identified in the proof of loss if

60

damages from a covered occurrence accrued over a period of time.  In other words, when the evidence is viewed in the light most favorable to GE, if the theft on November 20, 2010, resulted in damages that accrued over a period of time, GE is not necessarily required to identify each day after November 20 when damages accrued.

ASI has not cited to any authority or provision of the Policy requiring each specific date of loss be listed in a proof of loss, and the court finds nothing in the Policy that requires such specificity in the proof of loss form.  (*See* Doc. 67-1, pp. 32-33).  Moreover, the proof of loss form requests the "time and <u>origin</u>" of the loss, which suggests the form requires the insured to identify the date on which the loss began rather than each individual date of loss.  (Docs. 67-23, p. 2; 67-24, p. 2) (emphasis added).

ASI has not carried its burden of showing it is entitled, as a matter of law, to a declaration that GE's claim is limited to damages that were incurred on November 20, 2010.  As a result, ASI is also not entitled to summary judgment on the grounds that GE cannot prove any recoverable damages occurred on November 20, 2010.

ii. <u>ASI is not entitled to partial summary judgment on GE's claims for damages to the Property's roof and interior</u>

ASI asserts it is entitled to summary judgment as to GE's claim for damages to the Property's roof and interior because there is no evidence to create an issue of

61

fact regarding if damage to the Property's roof and interior occurred during the Policy Period.[29]  (Doc. 67-1, pp. 34-38).  Once again, the court is not persuaded. Indeed, GE points to several pieces of evidence to create a question of fact regarding if damage occurred to the roof and interior of the Property during the Policy Period.

First, in FSC's bankruptcy proceedings, Yair Ben Moshe, a manager of FSC, submitted a declaration dated August 17, 2010, in which he stated the following:

> I also instructed a local friend in Alabama to inspect the site periodically so that I would be informed of the condition of the Property.  I have recently received photos as well as the regular report as to the condition of the Property.  The Property is clean and the parking lot is empty.  The Property is secure with no apparent vandalism.  The Debtor has received no reports of any vandalism at the site.

(Doc. 73-2, p. 3).  He submitted a second declaration dated October 5, 2010 in which he again stated:

> Since the last status conference, the Property is clean and the parking lot is empty.  The Property is secure with no apparent vandalism.  The Debtor has received no reports of any vandalism at the site.

(Id., p. 3).  ASI offered no evidence to rebut Ben Moshe's statements, but instead objected to them as hearsay and because there is no evidence Ben Moshe went onto the roof or visited the Property.  (Doc. 77, p. 14).  However, "'a district court

---

[29] Varnado and Jerkins's opinions regarding the value of the loss attributable to the Property's electrical components and HVAC units, which are inadmissible because they do not meet the requirements of Rule 702, are not the only evidence of damage to the Property's roof and interior.

may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.'" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999)). Accordingly, the court may consider Ben Moshe's declarations.

Next, Richard Crooks testified that during a visit to the Property on November 18, 2010, he observed damage to HVAC units on the roof and observed holes in the roof where HVAC units had been moved off their curbs.  (Doc. 67-28, pp. 4-6).  Additionally, Crooks testified the damage he observed appeared to be recent.  (Id., p. 8).  Pac Zachary observed damage to the Property during the Policy Period when he visited the Property on January 20, 2011, and observed debris around the Property, a broken window, and damage to every HVAC unit on the roof.  (Doc. 67-13; Doc. 67-31, pp. 27-28).   Zachary also observed "some bubbled/soft spots" on the roof during his visit to the Property, which Varnado testified indicate water trapped beneath the roof membrane.  (Doc. 67-13, p. 4; Doc. 67-30, p. 56; *See also* Doc. 74-1, p. 6).   Additionally, during Zachary's February 14, 2011 visit to the Property, which was only twelve days after the end of the Policy Period, he saw evidence of water damage inside the building.  (Doc. 67-13, p. 37-38).

Taken together, the evidence cited by GE is sufficient to support a reasonable inference that the roof and interior of the Property were damaged during the Policy Period.  Indeed, the evidence regarding damage to the Property in this matter is very different than the evidence presented in *General Star Indemnity Co. v. Sherry Brooke Revocable Trust*, 2001 WL 34063890 (W.D. Tex. March 16, 2001), the case ASI relies upon to support its argument that GE cannot prove a covered loss occurred during the Policy Period.  (See Doc. 67-1, pp. 35-26).  In *General Star*, the insurer sought a declaration that losses claimed by the defendants for damage caused in part by plumbing leaks at apartment complexes were not covered by an insurance policy.  *Id.* at *1.  The insurer moved for summary judgment, and the defendants argued there were issues of fact regarding if the plumbing leaks commenced during the policy period.  *Id.* at *12.  The court rejected the defendants' argument and granted summary judgment in favor of the insurer in part because there was ample evidence the plumbing leaks commenced prior to the policy period.  *Id.* at *13-15.

Unlike in *General Star*, in this matter, ASI has not pointed to any evidence the losses claimed by GE were incurred prior to the Policy Period.  Instead, as discussed above, there is evidence in the record to support a finding the Property was not damaged prior to the Policy Period.  Thus, there is a question of material fact regarding if losses to the roof and interior of the building occurred during the

Policy Period, and ASI is not entitled to summary judgment as to GE's claim for damages to the roof and interior of the building.

## IV. <u>CONCLUSION</u>

Based on the foregoing, GE's motion to strike (Doc. 79) is **DENIED**. ASI's motion to exclude (Doc. 68) is **DENIED** as to the allegedly undisclosed opinion the roof deteriorated beyond repair over the course of two months following November 20, 2010. The balance of ASI's motion to exclude is **GRANTED**. Accordingly, Varnado and Jerkins cannot offer the following opinions at trial:

(1) thieves or vandals accessed and caused damage to the interior of the building at the Property during the Policy Period;

(2) the value of the loss attributable to the electrical components stolen or vandalized in the interior of the building at the Property;

(3) the Property's roof membrane was damaged when thieves drug sharp metal pieces across it;

(4) the value of the loss attributable to the HVAC units damaged at the Property; and

(5) HVAC units at the Property were subject to theft or vandalism during the Policy Period.

ASI's motion for summary judgment (Doc. 67) will be granted with respect to FSC and GE's counterclaim for bad faith. ASI is entitled to a declaration there

is no coverage under the Policy for a claim by FSC, and GE's counterclaim for bad faith is due to be dismissed with prejudice.  A separate order will issue.  ASI's motion for summary judgment will be denied with respect to its claims against GE and GE's counterclaim for breach of contract, and these claims will proceed.

**DONE** this 18th day of July, 2016.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE